NATIONAL LABOR RELATIONS
BOARD, Appellant,

v.

ALAMO WHITE TRUCK SERVICE,
INC., Appellee.

No. 17764.

United States Court of Appeals
Fifth Circuit.

Dec. 29, 1959.

Allison W. Brown, Jr., Atty., Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Rothman, Gen. Counsel, Frederick U. Reel, Atty., N.L.R.B., Washington, D. C., for appellant.

Theo. F. Weiss, Clemens, Knight, Weiss & Spencer, San Antonio, Tex., for respondent.

Before HUTCHESON, JONES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The question for decision is whether the respondent is a successor employer, for the purpose of an unfair labor practice proceeding, and as such bound to honor NLRB certification of unions certified as the bargaining representatives of the predecessor employer.

The complaint charged Alamo White Truck Service, Inc. of San Antonio, Texas, with violating Sections 8(a) (3) and 8(a) (5) of the National Labor Relations

Act, 29 U.S.C.A. § 158(a) (3, 5). The trial examiner recommended dismissal of the complaint in its entirety. The National Labor Relations Board sustained the trial examiner as to the 8(a) (3) charge [1] but found that Alamo had violated Section 8(a) (5) in refusing to bargain with the Teamsters and Machinists Unions,[2] certified, according to the Board, as the exclusive bargaining representatives of Alamo's employees. Alamo admits that it refused to bargain with the unions, basing its refusal on the fact that the unions were certified as the bargaining representatives of the San Antonio branch of the White Motor Company of Cleveland, Ohio. White, Alamo contends, was an entirely different company and an essentially different employment enterprise. The Board held that Alamo "had taken over substantially intact the business formerly operated by White, and [as] a successor employer" is obligated to honor the certification. 122 N.L.R.B. No. 139. The Board now petitions this Court for enforcement of an order requiring Alamo to cease and desist from refusing to bargain with the unions.[3]

We hold that there is no substantial evidence to support the finding of the Board, and deny enforcement of the order.

It has been held that a mere change in ownership is not so unusual a circumstance as to affect certification. Where "the [employment] enterprise remains essentially the same, the obligation to bargain of a prior employer devolves upon his successor in title". Cruse Motors, Inc., 1953, 105 N.L.R.B. 242, 247. See N.L.R.B. v. Armato, 7 Cir., 1952, 199 F.2d 800, 803; N.L.R.B. v. Lunder Shoe Corp., 1 Cir., 1954, 211 F.2d 284, 285–287; N.L.R.B. v. Hoppes Mfg. Co., 6 Cir., 1948, 170 F.2d 962, 964; N.L.R.B. v. Blair Quarries, Inc., 4 Cir., 1945, 152 F. 2d 25. These are the cases the Board relies on.[4] The rationale underlying these

1. Under § 8(a) (3) respondent was charged with discriminating against five employees of the San Antonio branch of the White Motor Company by refusing to employ them, because of their union activities, when respondent "succeeded to the business of sale and service of White Trucks formerly owned and operated by White Motor Company".

2. Lodge 35, International Association of Machinists, AFL-CIO, and General Drivers and Helpers Local 657, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

3. The case is before the Court under Section 10(c) of the National Labor Relations Act, as amended (61 Stat. 136, 29 U.S.C.A. § 151 et seq.), following the usual proceedings under Section 10 of the Act.

4. These cases are distinguishable on the facts. Inferentially, they support respondent's position.

In Armato the owner of a business leased the business to the respondent who formed a corporation for the purpose of taking over the business. About the only difference between the operation of the new company and the old company was that the respondent used only eight of the twenty-five former employees. The court held that the fact that only eight of the employees were members of the union originally, while seventeen were newcomers, was immaterial, since only the identity of the employer had changed and there was no reason to think that the attitude of the employees to the union had changed.

In Lunder a certification was issued covering employees of the Mitchell Shoe Company. In January, 1951, Mitchell sold the business to Lunder who operated for a year under the name Lunder Shoe Company. Lunder's objective in purchasing the business was to acquire a shoe business for his son, Bruce. In February, 1952, Lunder and another formed a corporation, known as the Bruce Shoe Company, which took over the plant. The only changes Lunder made were a realignment of certain machinery and the hiring of 132 employees instead of 250, although 100 to 175 were later rehired and well over fifty per cent of Mitchell's employees eventually went on the Bruce payroll. The court held that the Board was amply justified in finding that Lunder was "merely a disguised continuance" of Mitchell. The Board, however, had contended that the order ran also against Bruce as a "successor and assign" under the doctrine of Regal Knitwear Co. v. N.L.R.B., 1945, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 and Southport Petroleum v. N.L.R.B., 1942, 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718. The court held against the Board, on the ground that there was no evidence that Lunder

holdings is stated in N.L.R.B. v. Colten, 6 Cir., 1939, 105 F.2d 179, 183: "It is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interests of industrial peace. * * * It needs no demonstration that the strife which is sought to be averted is no less an object of legislative solicitude when contract, death, or operation of law brings about change of ownership in the employing agency."

■ It is not necessary to discuss the correctness of this principle. The bona fide purchaser of a business, however, is not ipso facto a successor employer bound by an unsuspected transferee obligation to remedy the seller's unfair labor practices and to honor a union certification binding the seller. Where "the nature or extent of the employing enterprise, or the work of the employees, is substantially changed, the transfer of a part, or even all, of the physical assets does not carry along with it [to the purchaser] the duty of the former owner to continue bargaining with the former exclusive representative". Cruse Motors, Inc., 1953, 105 N.L.R.B. 242, 247. See Juneau Spruce Corp., 1949, 82 N.L.R.B. 650; Southwestern Greyhound Lines, 1955, 112 N.L.R.B. 1014; Herman Lowenstein, 1947, 75 N.L.R.B. 377; Sewell Mfg. Co., 1947, 72 N.L.R.B. 85; Tampa Transit Lines, 1946, 71 N.L.R.B. 742. See also N.L.R.B. v. Parran, 4 Cir., 1956, 237 F.2d 373.

The question before us therefore, within the scope of our reviewing authority, is not whether Alamo, actually or in effect, purchased the White business in San Antonio, all or a large part of it. This is but one element. It must be weighed along with other elements in determining the critical question: is the employing enterprise substantially the same under Alamo as it was under White? To supply the answer it is necessary to take a close look at the record.

The White Motor Company is a well-known, large, and successful manufacturer of trucks. Its head office is in Cleveland, Ohio. For several years White maintained a retail branch in San Antonio, Texas. In December, 1956, the company decided to close its San Antonio branch, after having considered closing it as far back as October, 1956. The decision was admittedly for business reasons and had nothing to do with any union activity.[5] On June 28, 1957, White closed the branch and announced this fact in advertisements in the San Antonio newspapers.

In the spring of 1957 the Teamsters and Machinists began a joint organizational drive at the San Antonio branch, the Teamsters to represent the men in the parts department and the Machinists to represent the mechanics and shop

had "ownership interest in or managerial control of Bruce". [211 F.2d 289.] On the contrary, the record shows that Lunder purchased the plant and sold it to Bruce in order for Lunder's son to engage in the shoe business.

In Hoppes the change was simply the transfer of a majority of the capital stock of the company.

In Blair Quarries the owner of the quarry leased to Blair "without change of personnel or in manner of doing business". The court pointed out that Blair failed to show, at the time it refused to bargain, that the union had lost its majority.

See 42 A.L.R.2d 1415, 1459; N.L.R.B. v. Birdsall-Stockdale Motor Co., 10 Cir., 208 F.2d 234, 46 A.L.R.2d 592; 55 Colum. L.Rev. (1955) 405; 11 Okla.L.Rev. (1958) 87.

5. The trial examiner found: "At Dallas, Texas, the White Motor Company has and at all times material hereto had a large and flourishing wholesale and retail sales and distribution agency—in fact 10 times as large as 'Alamo' or the San Antonio Branch. (The San Antonio branch of the Company was completely minor in the affairs of the White Motor Company of Cleveland with respect to sales, distribution, and servicing of its products as compared with the Dallas Branch.) It was decided to close the San Antonio outlet on June 30th, and to transfer all sales and distribution of its trucks to the Dallas Branch. The obvious reason was that sales of trucks had declined in 2½ years from 85 in 1955 to 34 in 1957, with a corresponding drop in income from $829,741 to $491,374. Also, San Antonio's 2 largest customers had moved to Houston and El Paso."

employees. Strong feeling developed between the advocates and the opponents of the unions. A representation election was held in a tense atmosphere. The unions won the election by a vote of eight to seven. June 20, 1957, the Board certified the unions as the exclusive bargaining agents of the White employees at San Antonio. June 24, 1957, the unions requested the San Antonio branch to bargain with the unions. The next day White, through its head office in Cleveland, notified the unions that the branch was terminated and that employment of all employees was ended as of June 30, 1957. The unions then requested that Alamo recognize them as the bargaining representatives of Alamo's employees. Alamo refused to do so.

The Board makes no contention that the closing of the branch had anything to do with union activity. It makes no contention that the organization of Alamo as a completely independent business was not bona fide.

When it had become apparent that White intended closing the San Antonio branch, Lloyd Cregor, the branch manager, and Willard Boone, the principal salesman, decided to set up an independent business to service and sell trucks, particularly White trucks. They raised $50,000, using their savings and borrowing on their life insurance, and on June 19, 1957, Alamo was incorporated with Cregor as president and general manager and with Boone as vice-president and treasurer. White, of course, had been looking for a local dealer and shortly before July 1 entered into the usual local retail dealership agreement with Alamo.

Alamo bought from White the initial inventory of parts, tools, shop equipment, and office equipment. There was how-ever a complete severance with White. Thus, Alamo did not purchase the accounts receivable. It did not assume any of the indebtedness or obligations of the old factory branch. It did not acquire any of White's books and records. A new system of bookkeeping was installed. White cancelled all of its liability insurance and other insurance; Alamo arranged for its own insurance with companies which were not the same as those that had carried White's insurance, and Alamo was not permitted to claim credit for the Workmen's Compensation experience of the factory branch. Alamo obtained a new Texas business license. Alamo employed a different method of financing the sale of automotive equipment.

White owned the building in which its factory branch was located. It put up the property for sale, giving Alamo only a one-year lease on part of the building, with no option to renew.

Alamo opened for business with a work force of seven mechanics. There was no parts department and no employees charged with selling parts.[6] White had employed twelve mechanics. The five former employees of White not employed by Alamo were the only White mechanics who had joined the union and, presumably, voted for the union at the election (the other three votes in favor of the unions came from the parts department). Accordingly, and as the record tends to show, none of Alamo's employees belonged to either of the unions or had ever belonged to either of the unions and, presumably, none of the Alamo employees voted for representation by these unions at the election at the San Antonio branch of White Motor Company.[7]

As the trial examiner pointed out, "not only the business but the functions

---

6. The unit defined in the White proceeding included employees in the parts department. Further, White had no diesel department or diesel mechanics; Alamo had a diesel department and diesel mechanics.

7. The record is silent as to how the employees voted. However, in attempting to sustain the 8(a) (3) charge, the Board showed that the five mechanics Alamo had not employed July 1, 1957, were the only White employees who had taken out membership in the Unions. The respondent showed that none of its employees belonged to either union and some opposed the Unions vigorously.

changed". The branch was controlled entirely from Cleveland, Ohio. All policies were determined at the home office of the White Motor Company in Cleveland and centered around the fact that the company was engaged in manufacturing trucks and selling trucks on a nation-wide scale. The policies were transmitted to the branch manager through a White vice-president and the regional director. On the other hand, with Alamo, control of policy is vested in the officers and directors of a small, independent business. The trial examiner found that Alamo operated as "primarily a service operation"; its sales, such as they were, those of a local, retail nature.

The difference in the nature of the business and in the functions is of material importance in determining the employee-employer relationship. During the time the branch in San Antonio was in operation all White's labor policies were determined in Cleveland; local White employees received their instructions and were "placed under" R. C. Crotty, a labor relations director with his head office in Cleveland. Thus, at the time of the hearing in the representation case, Mr. Crotty was in San Antonio and instructed Cregor, the branch manager, exactly what to do. The branch manager had no discretion or independence in the matter; he carried out instructions he received from the labor relations director in Cleveland. The same thing was true with reference to sales policies, purchase policies, and all other important matters. Although no large company fails to consider local conditions, there is a substantial difference, in general and in this case, between the policies and operations of a large, nationwide organization and those of a small local business.

We regard the employee-employer relationship as a most important element in determining whether there is sufficient continuity between two employing enterprises to justify enforcing an NLRB order against a company that was not a party to the original proceeding that generated the certification. The employee-employer relationship in the operation of Alamo was materially different from the employee-employer relationship in White Motor Company, not just because of a difference in the number of employees or in the turnover, but because the interaction of the employee group with the management of Alamo was completely changed. We mean by this, the difference between the close personal relationship of management and workers characteristic of a small, local business, existing in this case as the record shows, and the disembodied relationship of workers to top management not uncharacteristic of a large corporation when branch workers must accept policies fixed by some far-off head office. We mean also that, although generally a fluctuation in personnel may be immaterial, here the particular workers employed by Alamo as a group had little in common with the group employed by White, particularly in regard to unionism.[8]

If Alamo were ordered to bargain with the Teamsters and Machinists, the unions would be bargaining for employees not one of whom belonged to either of these unions. This is something less than carrying out the purpose of a statute intended to enable employees to select bargaining agents of their choice to deal with their employer.

Considering the clean break between White and Alamo, considering too the difference in policies, operations, personnel, and employer-employee relationship between White and Alamo, we find no substantial evidence to justify the imposition of what amounts to an unbargained-for servitude or restrictive covenant running with a business. As the trial examiner put it, the "parental relationship between White and its San Antonio operation was abrogated—the umbilical cord had been severed". We add, and the child bears no resemblance to its parent.

The petition for enforcement is denied.

---

8. We rest our decision on the lack of evidence to support a finding that the principle of successorship applies to Alamo.

We consider it unnecessary therefore to discuss Brooks v. N.L.R.B., 1954, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125.