NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

AUTO VENTSHADE, INC., Respondent.

No. 17965.

United States Court of Appeals
Fifth Circuit.

March 25, 1960.

Rehearing Denied July 28, 1960.

Cameron, Circuit Judge, dissented.

Melvin Pollack, Atty., Thomas J. Mc-Dermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Rothman, Gen. Counsel, A. Brummel, Atty., N. L. R. B., Washington, D. C., for petitioner.

Alexander E. Wilson, Jr., John W. Wilcox, Jr. (of Wilson, Branch & Barwick), Atlanta, Ga., for respondent.

Before RIVES, Chief Judge, and CAMERON and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

In this case, as in National Labor Relations Board v. Alamo White Truck Service, Inc., 5 Cir., 1959, 273 F.2d 238, recently decided, the question for decision is, whether the respondent is a successor employer for the purpose of an unfair labor practice proceeding and is therefore bound by a National Labor Relations Board certification to bargain with the union designated as the bargaining representative of the predecessor employer.

The complaint charged the respondent, Auto Ventshade, Inc., with violating Sections 8(a) (5) and (1) of the National Labor Relations Act [1] by refusing to recognize and bargain with the Union.[2] The trial examiner found for the petitioner and recommended a cease and desist order enjoining respondent from continuing its unfair labor practices. After the usual proceedings, the Board adopted the findings, conclusions, and recommendations of the trial examiner. The Board ordered the respondent to cease and desist from refusing to bargain with the Union or interfering with, restraining, or coercing employees in the exercise of their rights under Section 7 of the Act. The order affirmatively required the respondent to bargain with the Union upon request and to post appropriate notices. 123 N.L.R.B. No. 54.

The case is before the Court on the petition of the Board for enforcement of its order against Auto Ventshade, Inc.[3] We hold that there is substantial evidence to support the Board's findings and grant enforcement of the order.

Section 8(a) of the Act makes it an unfair labor practice to refuse to bargain in good faith with the certified representatives of the employees. National Labor Relations Board v. Fant Milling Co., 1959, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243. This obligation to bargain binds a successor employer. A mere change in ownership is not so unusual a circumstance as to affect certification. National Labor Relations Board v. Alamo White Truck Service, supra; National Labor Relations Board v. Armato, 7 Cir., 1952, 199 F.2d 800. The crucial question in determining if the certification is binding on the successor employer is whether the employing industry remains essentially the same after the transfer of ownership. National Labor Relations Board v. Alamo White

1. 61 Stat. 136, 29 U.S.C.A. § 151 et seq.

2. International Union, United Automobile, Aircraft & Agricultural Implement Workers of America, UAW–AFL–CIO, Local 472.

3. The case is before this Court under Section 10(c) of the Act, following the usual proceedings under Section 10.

Truck Service, supra; National Labor Relations Board v. Lunder Shoe Corp., 1 Cir., 1954, 211 F.2d 284. The answer to this question requires a close examination of the facts.

■ From 1947 to May 3, 1957, Auto Ventshade, under the ownership of its president, Asa R. Phillips, Sr., manufactured and sold auto ventshades at its plant in Chamblee, Georgia.[4] In 1950, the Board certified the Union as the collective bargaining representative of the production and maintenance employees. Auto Ventshade Company bargained in good faith with the Union. A series of contracts were drawn up between them. Ventshade deducted union dues from the employees' wages.

Changes in car designing made ventshades more difficult to sell. The business declined until by 1957 the company had only thirteen employees; these employees were working intermittently. May 3, 1957, Ventshade stopped its manufacturing operations and notified its employees that their employment was terminated. The employees were told that the business might be purchased by Phillips' son, Asa R. Phillips, Jr., and Phillips' son-in-law, H. W. Goodman. Phillips, Sr., told the employees that the new owners, if they bought the business, would hire their own employees. May 10, 1957, the corporate name of Auto Ventshade Company was changed to Phillips Company. Phillips, Sr. owned 99 per cent of the stock and was president of the corporation. Phillips, Sr. notified Ventshade's customers that the business was being sold to a new corporation headed by his son and son-in-law, and that the new corporation would continue operations "in the usual manner * * * at the same address". May 13, 1957, the respondent corporation was organized. The stock was divided among Phillips, Jr., Goodman, and Goodman's wife. Phillips, Jr. became president of the new corporation. Goodman was named secretary-treasurer. Phillips, Sr. has no financial ownership, control, or interest in the new corporation. Since May 10, 1957, Phillips Company has engaged in the investment business and has had no connection with manufacturing or selling ventshades.

May 13, 1957, the respondent purchased the trade name and trade-mark "Ventshade", the accounts receivable, and substantially all the machinery equipment, supplies, furniture and fixtures used by the Phillips Company, formerly Auto Ventshade Company. The respondent leased a portion of the premises previously occupied by Ventshade. Respondent remained in these premises until July 1, 1958. May 17, 1957, Phillips, Jr. notified Ventshade's former customers that respondent had purchased the business and would "continue to manufacture ventshades at the same location". Prices, terms, discounts, and the "Buyer's Guide and Recall Plan" also would continue to be the same.

Respondent began manufacturing operations on May 20, 1957. Ventshade's former supervisor, Carl Meade, worked for respondent in the same capacity. Phillips, Jr., the president of the respondent, had been the vice-president of Ventshade. Goodman, the secretary-treasurer of respondent had held the same position with Ventshade. During the week of May 20th the respondent hired seven employees. Six of them had been employed by Ventshade when it ceased operations on May 3rd. About July 15, 1957, respondent hired five employees who had never worked for Ventshade.

May 5, 1957, the Union, in a letter addressed to Phillips, Sr., Phillips, Jr., Goodman, and the respondent, charged that respondent had violated the agreement between the Union and the Company and requested a meeting to discuss these matters.[5] May 22, Phillips, Jr.

---

4. A ventshade is a stainless steel visor, designed to fit over the side windows of an automobile. It permits fresh air to enter while protecting the occupants from rain and sun.

5. The letter concluded: "At the meeting we will be willing to discuss any matters pertinent to the reopening of the Company, including the fact that there has been no change in the bargaining rela-

replied by letter, refusing to recognize the Union as the bargaining representative of the employees. In another letter, dated October 21, 1957, the Union urged respondent to bargain with it "as exclusive representative of your employees." Respondent again declined, saying that it would recognize the Union only if it were certified in due course by the Board.

The Board found that although the transfer of Ventshade's manufacturing business was a bona fide business transaction this did not affect the continuity of the employing industry. Ventshade's obligation to bargain with the Union devolved on respondent.

Respondent emphasizes that there is no similarity of stock ownership between Phillips Company and the respondent. Phillips, Sr. owns virtually all of the Phillips Company; he has no interest in respondent. Respondent makes other points. Although respondent bought the assets of Phillips Company it assumed none of the liabilities. Respondent secured a new social security employer's number and a new withholding tax number, and took out new insurance policies covering workmen's compensation employer liability and the usual risks. The Georgia Unemployment Compensation Commission would not allow the respondent to claim credit for the experience rating of Ventshade. Respondent obtained a new Georgia sales tax exemption and purchased a new business license. In October 1958 work was started on a new product, garnishields.

Relying heavily on the Alamo case,[6] the respondent argues that the facts indicate clearly that it is not a successor employer. In a number of respects the instant case is similar to Alamo. In certain important respects, however, there are material differences between the two cases. In Alamo the nature and functions of the employment enterprise changed: the predecessor employer was a branch office of a large national organization engaged in selling trucks; the successor employer was a small, independent, local business that was "primarily a service operation". In the instant case there has been little, if any, change. Here, the parties stipulated that the respondent was engaged in manufacturing substantially the same product manufactured by Ventshade, using substantially the same machinery, equipment and fixtures, and using substantially the same materials used by Ventshade. Alamo did not purchase the accounts receivable of its predecessor; respondent did. For all practical purposes there was continuity in the nature and functions of the same employing industry.

In Alamo there was a distinct change in the employer-employee relationship. "We mean by this, the difference between the close personal relationship of management and workers characteristic of a small, local business, existing in this case as the record shows, and the disembodied relationship of workers to top management not uncharacteristic of a large corporation when branch workers must accept policies fixed by some far-off head office. We mean also that, although generally a fluctuation in personnel may be immaterial, here the particular workers employed by Alamo as a group had little in common with the group employed by White, particularly in regard to unionism." N. L. R. B. v. Alamo White Service, Inc., 5 Cir., 1960, 273 F.2d 238. Here there has been no marked change. Control of policy is still vested in the

tionship between the Company and the Union because of the technical fiction of incorporation."

6. " * * * The bona fide purchaser of a business, however, is not ipso facto a successor employer bound by an unsuspected transferee obligation to remedy the seller's unfair labor practices and to honor a union certification binding the seller. Where 'the nature or extent of the employing enterprise, or the work of the employees, is substantially changed, the transfer of a part, or even all, of the physical assets does not carry along with it [to the purchaser] the duty of the former owner to continue bargaining with the former exclusive representative.' " N.L.R.B. v. Alamo White Truck Service, Inc., 5 Cir., 1959, 273 F.2d 238, 240.

officers of a small corporation. Phillips, Jr. has stepped up from vice-president of the old company to president of respondent. Goodman occupies the same position. They continue to perform essentially the same supervisory function that they had performed as officers of Ventshade. Carl Meade, Ventshade's supervisor was retained in the same position by respondent. Many of respondent's employees had previously worked for Ventshade. Only seventeen days elapsed between the time Ventshade ceased operations and the time respondent commenced operations with the same managerial personnel, the same employees except one, the same supervisor, manufacturing the same products, using the same materials and equipment, and selling to the same customers.

■ In the interest of orderly labor relations and effective collective bargaining, an employer, absent unusual circumstances, must honor a Board certification for at least one year, and must continue to honor it unless "he has fair doubts about the union's continuing majority". Brooks v. N. L. R. B., 1954, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125. As stated in N. L. R. B. v. Sanson Hosiery Mills, 5 Cir., 1952, 195 F.2d 350, certiorari denied, 344 U.S. 863, 73 S.Ct. 103, 97 L.Ed. 669:

> "Although certification of a bargaining representative by the Board is not intended to create a permanent relationship without regard to new situations that may develop, there must be a reasonable measure of stability to the relationship so established, as it is one of the objectives of the Act to stabilize as well as improve industrial relations. Such a certification, when lawfully made must be respected by the employer until changed conditions are reflected by a later ruling by the Board altering or setting aside the certification. This is true, even though the bargaining agent so designated has lost its majority representation of the employees by reason of the subsequent defection of some of those originally voting for it as their representative. The existing certification must nevertheless be honored until lawfully rescinded." [195 F.2d 252.]

■ Respondent contends that it had reasonable grounds to doubt the Union's claim to represent a majority of the employees. As proof, respondent points to the fact that all of its production employees filed a petition for decertification, signed by each employee, stating: "We the undersigned do not wish to be represented by UAW-CIO." This petition was filed February 2, 1959. But during the week of May 20, 1957, when the plant was reopened, a clear majority of the employees were represented by the Union. This was known to the employer, for the production and maintenance employees were all members of the Union and had voluntarily authorized respondent to check-off union dues from their wages. Goodman, as Ventshade's secretary-treasurer, had remitted checked-off dues to the Union, including dues for April and May 1957. Accordingly, when respondent refused to honor the certification, it knew that its employees, all but one of whom had been in Ventshade's employ when Ventshade ceased production on May 3, 1957, were members in good standing of the Union.

■ In a case concerning a successor employer, principles of fair play require that we look to the time of the succession to determine if the Union represents a majority of the employees. The employer is not without remedy. The employer's proper course is to recognize the prima facie union representation of the employees and to continue to deal with the union, but to petition the Board for a new election.

After the Board hearing but before the issuance of the Board's order the respondent and its employees filed representation petitions with the Board. These petitions collide with the Board's policy of not conducting representation elections during the pendency of unfair labor practice charges. This Court has

**308**

approved the Board's policy. N. L. R. B. v. Taormina, 5 Cir., 1953, 207 F.2d 251; N. L. R. B. v. Sanson Hosiery Mills, 5 Cir., 1952, 195 F.2d 350, certiorari denied, 344 U.S. 863, 73 S.Ct. 103, 97 L.Ed. 669; N. L. R. B. v. Houston & North Texas Motor Freight Lines, 5 Cir., 1951, 193 F.2d 394.

The policies, operations, personnel, and employer-employee relationship of Ventshade have not substantially changed because of the change of ownership to respondent. The petition for enforcement of the Board's order is granted.

CAMERON, Circuit Judge, dissents.

Rehearing denied; CAMERON, Circuit Judge, dissenting.