**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**TEMPEST SHIRT MANUFACTURING
COMPANY, Inc., Respondent.**

No. 16957.

United States Court of Appeals
Fifth Circuit.

Dec. 27, 1960.

**2**

Joseph C. Thackery, Atty., Marcel Mallet-Prevost, Asst. Atty. Gen., N. L. R. B., Washington, D. C., for petitioner.

E. Kontz Bennett, Waycross, Ga., for respondents Robert Pascal and Pascal Corp.

Oscar B. Sachs, New York City, for respondents Charles S. Kaufman, Brewster Shirt Corp. and Sea Island Shirts, Inc.

Before RIVES, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The question before us is whether the respondent, Pascal Corporation, is a successor employer to the original respondent, Tempest Shirt Manufacturing Company, Inc., so as to be bound by a decree of this Court enforcing an order of the National Labor Relations Board directed to Tempest. This earlier decree directed Tempest, its "officers, agents, successors, and assigns", to reinstate at its plant in Jesup, Georgia, three of its former employees and to make them whole for loss of pay suffered because of discrimination against them. Tempest made no effort to comply with this order. It went out of business, and transferred all of its property to Pascal Corporation. The National Labor Relations Board now petitions this Court to adjudge Tempest, its former president Robert Pascal, its former vice-president Charles S. Kaufman, Pascal Corporation, Sea Island Shirts, Inc., and Brewster Shirt Corporation in civil contempt of this Court for refusal to comply with the Court's earlier decree. With certain modifications, we grant the Board's petition.

In 1949 Robert Pascal engaged in the shirtmaking business in Jesup, Georgia, as president of Sea Island Manufacturing Company, Inc., a Georgia corporation. Charles S. Kaufman, the president of Kaufman & Seidling, Inc., sold shirts in New York City. Pascal and Kaufman decided to pool their abilities in a joint shirtmaking and selling venture, the ultimate result being the formation of Tempest Shirt Manufacturing Company. The merger was accomplished by combining their interests with equal ownership of stock in their respective corporations. Pascal dissolved Sea Island of Georgia, transferring its machinery and fixtures to himself and his relatives. He then set up Tempest, transferring Sea Island's equipment to it. Tempest was formed as a Georgia corporation, authorized to issue 200 shares of common no par stock. Actually it issued only 100 shares of the stock,[1] transferring them to Pascal in consideration for Sea Island of Georgia's physical assets. Pascal then transferred these 100 shares to Kaufman & Seidling, so at this point Tempest was a wholly-owned subsidiary of Kaufman & Seidling. Kaufman & Seidling then split its stock four ways, dividing 200 shares by giving 50 to Pascal, 50 to Pascal's wife, 50 to Kaufman, and 50 to Kaufman's wife. The Pascals and the Kaufmans each owned half of Kaufman & Seidling, which owned all of Tempest; thus equal ownership and control of the corporations was achieved.

Kaufman & Seidling began retail operations, having been formerly wholesale only, and adopted the new name of Sea Island Shirts for these operations. All the stock in Sea Island of New York was issued to Kaufman & Seidling. In 1952 the retail and wholesale operations were completely merged, and Kaufman & Seidling formally changed its name to Sea

---

1. Tempest also issued 35 shares of preferred stock of $100 par value to its key employees as bonuses. It issued no other preferred stock, however, and the 35 shares represented no voice in the management or policies of Tempest.

Island Shirts, Inc., a New York corporation. Kaufman, Pascal, their wives and secretaries, were interlocking officers and directors of Sea Island of New York and Tempest. But this joint venture proved unworkable—it did not prosper, and apparently personality conflicts developed between Kaufman and Pascal. Accordingly, they began negotiations in 1956 to sever their business relations. The complete severance was consummated in 1957—before issuance of the order sought to be enforced here. To attain the mutual division, a series of complicated maneuvers was pursued, but briefly, what happened is this: the Kaufmans took over control of Sea Island and the Pascals took over control of Tempest's resources. The Kaufmans became the owners of all the common stock of Sea Island and thereby became the sole owners of Tempest, Sea Island's wholly-owned subsidiary. To receive Tempest's resources the Pascals formed the Pascal Corporation in Georgia, dividing its stock equally between Robert Pascal and his wife, Ruth. The Pascal Corporation opened its books in May 1957, after a tentative accord had been reached, but the transactions were not formally closed until early in June, when all papers were exchanged and final documents signed. The proper resignations and transfers of stock took place to accomplish the complete separation of business interests between the Pascals and the Kaufmans.

Tempest assigned all of its outstanding insurance policies to the Pascal Corporation. The corporation assumed the conditional sales liability on some of Tempest's machinery, took over accounts and loans, bought all office and factory supplies (except those with Tempest's name on them), took over an insurance policy on Pascal's life, acquired Tempest's Workmen's Compensation policy and experience rating, made new factory and warehouse leases under the same terms and with the same parties as the old ones, and assumed Tempest's plant expenses. During the transition period the plant was active at all times. Well over half of the Pascal Corporation employees had been employed by Tempest (including three supervisors who had been found by the Board to have committed unfair labor practices). The Pascal Corporation uses the same machinery, tools, furniture, autos, buildings, and fixtures that Tempest used, with the exception of some auxiliary equipment.[2] The Pascal Corporation performs the same basic production operations that Tempest performed: cutting, making, and trimming men's sport shirts.[3]

The Kaufmans subsequently sold Sea Island (and consequently its wholly-owned subsidiary, Tempest) to Brewster Shirt Manufacturing Company, Inc., a New York corporation, and its affiliate, the Maury Manufacturing Company, a Tennessee corporation. Thus, at the present time, Brewster and Maury own all of Sea Island, which still wholly owns Tempest; all four corporations have directors in common. Tempest has never been formally dissolved, nor has its legal existence been discontinued; but it is merely a "shell" or "hull" corporation, having no physical or financial assets. Furthermore, since June 1957 Robert Pascal and his wife have not acted in any way as officers or agents of Tempest or Sea Island.

In March 1957 the Trial Examiner issued his intermediate report finding violations of Section 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1) and (3), and finding that Robert Pascal had taken part in certain unfair labor practices at the Tempest plant in Jesup while he was president of that firm. This report was adopted by the Board September 9, 1957, five months after Kaufman and Pascal formally severed their business relations.

2. The Pascal Corporation purchased $6,000 worth of replacements and new equipment, and sold $9,000 worth of old machinery. The total machinery value of the plant is $100,000.

3. The Corporation began a "shirt jacket" operation six months after being formed, but the change was minimal. No new employees were hired to do the work.

The order was not complied with, and the Board petitioned this Court for summary enforcement October 23, 1957. We granted enforcement April 17, 1958. Two years have now passed since that date and the order still lies unenforced.

Robert Pascal's proprietary interest in the plant, machinery, fixtures and other facilities in Jesup has never substantially changed, and Pascal has continuously exerted managerial authority. The respondents point out that the Pascal Corporation issued 118 shares of preferred stock, totaling $84,500, held by citizens from all walks of life in Jesup and Wayne County, Georgia: doctors, lawyers, merchants, and others. Pascal took the initiative in obtaining capital for the Corporation from his friends in Jesup and Wayne Counties. Through two of his realty companies[4] he guaranteed their preferred stock purchases as well as a six per cent return. But these preferred stock owners have no rights to vote; they have attended no meetings; they exercise no real rights of management or authority. Robert Pascal retains proprietary control of Tempest's resources.

 This case is controlled by our decision in N. L. R. B. v. Auto Ventshade, Inc., 5 Cir., 1960, 276 F.2d 303. As we pointed out there, the crucial question for determining successorship is one of continuity: whether the industry remains essentially the same after the transfer of ownership. Id. at 304. It is quite obvious in this case that there has not been any substantial business change: the same products are made; the same machinery and equipment are used; the same supervisors and employees are retained; by purchase, Pascal has the same accounts receivable; and ownership and control of policy remain in the same individuals. This suffices to distinguish the case on the facts from N. L. R. B. v. Alamo White Truck Service, Inc., 5 Cir., 1959, 273 F.2d 238, in which this Court held that the new enterprise was not a successor:

"Alamo bought from White the initial inventory of parts, tools, shop equipment, and office equipment. There was however a complete severance with White. Thus, Alamo did not purchase the accounts receivable. It did not assume any of the indebtedness or obligations of the old factory branch. It did not acquire any of White's books and records. A new system of bookkeeping was installed. White cancelled all of its liability insurance and other insurance; Alamo arranged for its own insurance with companies which were not the same as those that had carried White's insurance, and Alamo was not permitted to claim credit for the Workmen's Compensation experience of the factory branch. Alamo obtained a new Texas business license. Alamo employed a different method of financing the sale of automotive equipment." 273 F.2d 238, 241.

The facts of the instant case bring it clearly within the scope of Auto Ventshade:

"[T]he respondent was engaged in manufacturing substantially the same product manufactured by Ventshade, using substantially the same machinery, equipment and fixtures, and using substantially the same materials used by Ventshade. Alamo did not purchase the accounts receivable of its predecessor; respondent did. For all practical purposes there was continuity in the nature and functions of the same employing industry." 276 F.2d 303, 306.

Here, as in the Auto Ventshade case, it is immaterial that the transfer of Tempest's manufacturing business to the Pascal Corporation was a bona fide business transaction carried out at "arm's length." See also McComb v. Jacksonville Paper Co., 1949, 336 U.S. 187, 69 S.Ct. 497, 93

---

4. Wayne Realty Company and Union Realty Company, both of whose officers are identical to those of the Pascal Corporation.

L.Ed. 599; Regal Knitwear Co. v. N. L. R. B., 1944, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661. The evidence clearly establishes that the Pascal Corporation is the successor to Tempest.

Robert Pascal and the Pascal Corporation are able to take the remedial action ordered in our earlier decree, and they are the proper parties against whom it should be enforced. Accordingly, we hold that Robert Pascal and the Pascal Corporation are bound by our order in the case of National Labor Relations Board v. Tempest Shirt Manufacturing Company, Inc., decided April 17, 1958.

■ The record indicates that Pascal was in charge of all operations in Georgia, including the labor policy, and that Kaufman had nothing to do with the unfair labor practices. For this reason we do not hold Kaufman, Sea Island Shirts, Inc., or Brewster Shirt Corporation in civil contempt. Tempest, being only a "shell" corporation, is not held in contempt, either. As modified, the Board's petition is hereby granted.