**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BACHRODT CHEVROLET CO., Respondent.**

**No. 71-1354.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1972.

Decided Sept. 13, 1972.

Rehearing Denied Nov. 9, 1972.

Rockford, Ill., for Bachrodt Chevrolet Co., respondent.

Before SWYGERT, Chief Judge, STEVENS, Circuit Judge, and ESCHBACH, District Judge.[1]

SWYGERT, Chief Judge.

This review of a National Labor Relations Board order concerns the relationship between a successor employer and an incumbent union: (1) Whether a transfer of some but not all of the assets of an existing business and the assumption of some but not all of its obligations effects a successor relationship; and (2) if so, whether the successor is required by law to honor an existing collective bargaining agreement and to bargain with the incumbent union. A third issue concerns an asserted "good faith" doubt entertained by the new employer that the union represented a majority of the employees.[2]

For a number of years the Lou Bachrodt Chevrolet Company of Rockford, Illinois had been a competitor of Zimmerman Chevrolet, Inc. located at nearby Freeport, Illinois. In the latter part of October 1969 the companies entered into a "Buy and Sell" agreement. Under its terms, Bachrodt agreed to purchase Zimmerman's new automobiles and trucks on hand and on order, new parts and accessories, miscellaneous inventories of materials, shop equipment and supplies, and to assume the leases covering the properties on which Zimmerman conducted its business. Work in progress in the repair and body shops was to be completed by Bachrodt at Zimmerman's expense. Current taxes, insurance, and similar charges were to be prorated. Bachrodt was to receive a copy of each contract or labor agreement to which

Marcel Mallet-Prevost, Asst. Gen. Counsel, Richard D. Zaiger, Atty., Eugene G. Goslee, Acting Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Nancy M. Sherman, Atty., N. L. R. B., for N. L. R. B.

Francis E. Hickey, Harold L. Turner, Henry J. Close, Miller, Hickey & Close,

1. District Judge Jesse E. Eschbach of the Northern District of Indiana is sitting by designation.

2. The Board's decision and order are reported at 186 N.L.R.B. No. 151 (1970). At the time we heard oral argument, NLRB v. Burns Int'l Security Servs., Inc., 441 F.2d 911 (2d Cir.), was pending in the Supreme Court on certiorari, 404 U.S. 822, 92 S.Ct. 99, 30 L.Ed.2d 49 (1971). Since the questions before the Court had an important bearing on our decision, we withheld our ruling. The Supreme Court's decision was announced May 15, 1972 (406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61), and thereafter we permitted the parties to file supplemental briefs.

Zimmerman was a party but only agreed to assume the obligations under a telephone directory contract, an inventory service contract, a pension plan Zimmerman had created for its employees, and an employees' group life and health insurance plan. No used cars or trucks were to be sold to Bachrodt, nor were Zimmerman's accounts payable or accounts receivable to be transferred to Bachrodt. In addition, the buy and sell agreement made no reference to Zimmerman's body shop. Finally, the entire transaction was subject to the approval of the General Motors Corporation and the grant to Bachrodt of an exclusive Chevrolet dealer franchise in Freeport. The agreement provided that the transfer of the title and possession of the assets was to take place on November 10, 1969.

Zimmerman's last day of operation was Saturday, November 8. Bachrodt's operations which began Monday, November 10, were identical with those of Zimmerman. Although there was evidence that Zimmerman's body shop manager, Russ King, had been negotiating with Zimmerman for the purchase of the body shop at the time the buy and sell agreement between Zimmerman and Bachrodt was executed, King's attempts to finance his purchase had not been completed by November 10. As a consequence, Bachrodt took over the body shop with the rest of Zimmerman's assets on that date and operated it until November 15 when the sale to King was consummated. Although the arrangements among the parties are not entirely clear, we think the trial examiner correctly found that on November 10 Bachrodt "took over and operated Zimmerman's old body shop as an integral part of its operation, and that the bodymen working at the shop were among its employees."

After the change in ownership there was a turnover among top management; however, Bachrodt retained Zimmerman's sales manager, four of its five salesmen, and two clerical employees. Bachrodt also retained all except two of the employees who worked in both the repair and body shops.

For many years the service department employees had been represented by Lodge 1096, International Association of Machinists and Aerospace Workers, AFL–CIO. In 1955, at a time when the Freeport Chevrolet agency was being operated by George F. Monroe (Zimmerman's predecessor), an election was held among certain employees of Monroe supervised by the mayor of Freeport, in order to determine whether they wished to be represented by the union. A majority of the employees voted in favor of such representation, and thereafter Monroe entered into a series of collective bargaining agreements. Similar agreements were made with Zimmerman after 1960. Each was a one-year contract, calling for an automatic year-to-year extension in the absence of notice to the contrary by either party. The last contract was signed on February 8, 1968. A year later, after meeting to evaluate the contract, Zimmerman's employees decided to request no changes. Since neither party gave the required notice requesting a renegotiation, the contract was automatically renewed for an additional year.

A few days prior to the transfer of the company from Zimmerman to Bachrodt, the employees were informed about the impending change in ownership, and representatives of the new company distributed job applications among the employees. On November 7, the union addressed a letter to the new owners pointing out that its "existing" agreement with Zimmerman was effective until February 1970 and that it was the union's "position that said labor agreement, in all its terms and provisions [was] equally binding on you as it was on Mr. Robert Zimmerman." Counsel for Bachrodt replied, stating that the company refused to negotiate with the union. Two days later the union again wrote the company requesting a meeting with regard to the "existing labor agreement" and also "to negotiate any and all matters pertaining to . . . conditions of employment" of its members employed by Bachrodt in Freeport. On November 14 the company reiterated its

position. It refused to meet with the union, asserting that it did "not know of its own knowledge if any of the former employees of Zimmerman . . . are represented" by the union. The company added that if the employees wished to have the union represent them they could apply to the National Labor Relations Board for an election.

In the meantime, on November 10, Bachrodt announced and later implemented a number of working conditions different from those applied by Zimmerman. These included a new method of computing the wages of the service mechanics, the termination of vacations with pay, and the initiation of mandatory Saturday morning work if an employee was so assigned.

The Board found that Bachrodt was a successor to Zimmerman, and, accordingly, had violated sections 8(a)(5) and (1) of the National Labor Relations Act by refusing to bargain with the union as the bargaining representative of its employees; by unilaterally changing its conditions of employment; and by refusing to honor the February 8, 1968 contract between Zimmerman and the union which was automatically renewed for one year on February 9, 1969. The Board's order, besides directing the company to cease the unfair labor practices found, required the company, upon request, to bargain with the union, to honor the existing collective bargaining agreement, and to make restitution for any benefits which may have been unlawfully withheld from the employees by reason of the company's failure to abide by the existing contract and for any benefits lost because of its unilateral institution of changes in working conditions.

### I

■■ The facts attending the transfer of the Chevrolet dealership in Freeport leave no doubt that the successorship doctrine was properly applied by the Board. The law establishes that if, after a transfer of assets and employees from one employer to another, the identity of the employing enterprise continues, the new employer has the duty as a "successor" to recognize and bargain with the union representative of the employees. *See, e. g.*, NLRB v. Armato, 199 F.2d 800 (7th Cir. 1952); NLRB v. Auto Ventshade, Inc., 276 F.2d 303 (5th Cir. 1960). A mere change in the ownership of the employing enterprise does not, by itself, relieve the new employer of bargaining with the existing representative of those employees who continue to be employed in the enterprise after the changeover. Tom-A-Hawk Transit, Inc. v. NLRB, 419 F.2d 1025 (7th Cir. 1969). The Supreme Court in its recent decision in NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), approved a Board order requiring a new employer to bargain with an existing union based solely on the fact that the new employer had "selected as its work force the employees of the previous employer to perform the same tasks at the same place they had worked in the past." In its decision the Court, speaking through Mr. Justice White, commented: "It has been consistently held that a mere change of employers or of ownership in the employing industry is not such an 'unusual circumstance' as to affect the force of the Board's certification within the normal operative period if a majority of employees after the change of ownership or management were employed by the preceding employer."

■ In the case before us, the Board found that Bachrodt's operations did not differ materially from those of Zimmerman. No other finding would have been warranted by the record. That Bachrodt did not purchase Zimmerman's entire assets or assume all its obligations is immaterial. The important fact is that the employing enterprise, here, the Freeport Chevrolet dealership, with respect to the nature of its business, was not materially changed. When that is considered with the fact that the new owner took over twenty-two of the twenty-four employees in the bargaining unit, there can be no

question that in the context of labor law, Bachrodt is a successor employer.

Our conclusion is unaffected by the fact that the body shop was operated by Bachrodt only for a few days after the transfer. Indeed, even if the body shop had been transferred to King prior to November 10, we would continue to characterize Bachrodt as a successor employer. Without counting the body shop employees, the company retained sixteen of the twenty-four employees in the bargaining unit. Moreover, the employing enterprise was substantially the same (although performing one less function) after the body shop was transferred to King.

## II

■ Bachrodt contends that even if it was Zimmerman's successor, its good faith doubt about the union's continuing majority status negated any obligation to bargain with the union in regard to the working conditions of the service department employees. To support its contention the company argues that certain facts should be considered: The union had never been certified by the Board; the only election among the employees was conducted by Freeport's mayor in 1955; since then, with one exception, there had been a complete turnover of employees; the last collective bargaining contract was signed twenty-two months before the change in ownership (the contract having automatically renewed itself in February 1969); and, since there was no dues checkoff provision in the agreement, the employer had no record of the dues paying members.

However, relevant the foregoing facts are, they could not, without more, form a reasonable basis for doubting the incumbent union's majority. Indeed, a review of the evidence suggests the opposite. The union had negotiated a series of collective bargaining agreements since 1955, first with Monroe, then with Zimmerman; the last agreement was negotiated in February 1968 and automatically renewed in February 1969. There was no direct evidence—not even a hint—that the union did not represent a majority of the employees in 1955 and nothing to indicate a change in circumstances since that time.

■■ Bachrodt, referring to *Burns*, emphasizes the failure of the union to be certified as the representative of the employees. However, as Bachrodt concedes, *Burns* did not involve a good faith doubt claim and therefore is not directly in point on this issue. To be sure, dicta in *Burns* indicates that a good faith doubt could not have been claimed in the face of a recent Board certification. But that is not to say that *Burns* also supports the obverse. Lack of certification does not by itself sustain a finding of a good faith doubt. *See* 406 U.S. at 279, n. 3, 92 S.Ct. at 1578. When, as here, there is at the least a prima facie showing that the union represented a majority of the employees within a year of the change in ownership, it must be presumed that the union's status continued beyond the changeover.

■ Finally, the company did not indicate a good faith doubt in its response to the union's demand that Bachrodt honor the agreement. It said only that it had no obligation to bargain because of the purchase of some of Zimmerman's assets and that it had no "knowledge" that the union represented a majority of the employees. That position is not tantamount to a good faith doubt.

## III

■ The Board, assuming that the successorship doctrine mandates an employer to take over responsibilities under the collective bargaining agreement of his predecessor, ordered that Bachrodt abide by the terms of the Zimmerman agreement and make restitution for any contractual benefits previously withheld. *Burns* overturned the premise upon which that order was based, holding that assumption of the preexisting contract was not an automatic consequence of successor status. Indeed, *Burns* sets up the opposite presumption. In cases, such as the instant one, in which successorship

is triggered by the fact that the employer's "operational structure and practices" remain the same and that a majority of those employed in the bargaining unit are retained, 406 U.S. at 280, 92 S.Ct. at 1578, the successor business is not required to honor the existing collective bargaining agreement.[3] Thus, that part of the Board's order which required that the respondent abide by the previous agreement and grant restitution for its past failure to do so cannot stand.

### IV

The Board's holding that Bachrodt's unilateral alterations in the working conditions of its employees constituted an unfair labor practice and its requirement that Bachrodt make restitution for any benefits which may have been lost by dint of such changes is supportable under the tests of *Burns*. The critical question in *Burns* relates to the timing of these changes—whether they predated or postdated the commencement of the duty to bargain. Once the duty to bargain is triggered, a successor employer's responsibilities are akin to those of an ordinary employer prior to the negotiation of a formal labor contract but after a bargaining representative has been selected when he has the duty to bargain and, the corollary duty, not to institute changes without consulting the union. In the successor situation this generally means that a successor employer can set the initial terms upon which rehiring is conditioned since prior to the rehiring of a substantial proportion of his predecessor's employees there is no duty to bargain. The only instance in which the duty to bargain may precede the formal rehiring of employees is where, as *Burns* states, "[I]t is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes

terms." 406 U.S. at 295, 92 S.Ct. at 1586. In *Burns*, the duty to bargain did not mature until late June, at the point when it became clear that the successor had hired the requisite complement of his predecessor's employees. However, the Court rejected the union's challenge to some of the changes in working conditions unilaterally instituted by *Burns* since they had been incorporated in the initial employment contracts and thus necessarily predated the duty to bargain.

Bachrodt presents a different situation since it appears that the contested changes in working conditions had not been a part of the initial terms of rehiring. The trial examiner found that Bachrodt's job applications, were distributed to all of Zimmerman's employees on November 7. Bachrodt's testimony suggests that, after brief individual interviews, he gave assurances to each employee that he would be rehired. In any event, it is clear that all those who had received applications on Friday appeared for work on Monday, with the exception of two who did not return the applications. · The trial examiner then found that the only changes in working conditions from those instituted by Zimmerman were the changes announced by Bachrodt at a meeting with employees held on Monday.

It is apparent from all accounts that as of November 7 Bachrodt planned "to retain all of the employees in the unit" and at such time, "it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms." *Burns, supra* at 295, 92 S.Ct. at 1586. Moreover, even were we to look only to when the contracts for rehire were formally consummated, the announced changes must have followed the formal rehiring. There is nothing to indicate that the employees were aware of the proposed changes on November 7. Nowhere were they told that they were to accept them or not

---

3. This is not to suggest that there are no cases in which an employer is bound to accede to the previous agreement. *Burns* specifically recognizes several situations in which the Board may find that the successor has in fact assumed his predecessor's contractual obligations. 406 U.S. at 291, 92 S.Ct. at 1584.

appear for work on Monday. Indeed, from the proffered testimony, the impression conveyed at the November 7 meeting was precisely the opposite. Hence, we affirm the Board's holding that Bachrodt's actions amounted to an unfair labor practice since they were in derogation of an existing duty to bargain and the Board's order requiring restitution for losses sustained.[4]

 At first blush it might seem that this determination is tantamount to a requirement that Bachrodt honor the existing collective bargaining agreement and that the same relief is being afforded by indirection that *Burns* directly forecloses. Further analysis proves otherwise. Bachrodt is free to alter unilaterally the terms and conditions of employment but only under certain conditions. Those conditions are that the company first bargain with the employees' representative and that the bargaining continue to an impasse; only then would Bachrodt be in a position to change the working conditions by unilateral action. A fair reading of *Burns* supports this conclusion.

The Board's order, except insofar as it requires the respondent to abide by the collective bargaining agreement executed between Zimmerman and the union, will be enforced.

STEVENS, Circuit Judge (dissenting in part).

The court holds that Bachrodt committed an unfair labor practice on Monday, November 10, 1969, when he entered into employment arrangements with Zimmerman's former employees on terms and conditions which differed from those which had been in effect when Zimmerman owned the business. There are three distinct theories which might support the holding.

## I.

As a successor to Zimmerman, Bachrodt might have been bound by the terms of his predecessor's labor contract. This was the theory of the trial examiner and the Labor Board. In the light of the Supreme Court's opinion in N. L. R. B. v. Burns International Security Services, Inc., 406 U.S. 272, 295, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), however, the Board has now abandoned that theory. Accordingly, Bachrodt did not succeed to Zimmerman's *contract* obligations and was free to set new terms when he hired his own personnel after purchasing the automobile agency.

## II.

As the new owner of the business, Bachrodt might have hired his employees on Zimmerman's terms, then, after a duty to bargain with the union arose, changed those terms without consulting the union. That, however, is not what happened.

Bachrodt's purchase from Zimmerman was closed on Monday, November 10, effective as of midnight on November 9.[1] Prior to the closing the relevant personnel were employees of Zimmerman. On Monday, the first day he owned the business, Bachrodt held a meeting of the employees and explained how the conditions of his operation would differ from Zimmerman's. True, Zimmerman had advised his employees of the pending transaction on the preceding Thursday, and Bachrodt passed out applications for employment on Friday,[2] but he did not

---

4. The General Counsel notes in his supplemental brief that the changes, according to the company, were either improvements or not implemented, which, if true, would not obligate the company to make any restitution to employees under the Board's order.

1. A. 198.

2. "Q When Bachrodt Chevrolet took over on November 10th, what if anything did

you do with regard to the men who had worked for Zimmerman with regard to taking applications or anything else? Just tell us what you did that day.

"A Before we took the place over we handed out applications to everybody. They were filled out and turned back in to us, and at that time we looked over each and then each man was interviewed. We decided whether [to] hire them, or they could make a decision on

hire any of Zimmerman's employees until after he became the owner of the business on Monday.[3] Since Zimmerman's labor contract was not binding on Bachrodt as a successor, it is therefore clear that the initial employment relationship between Bachrodt and the former employees of Zimmerman was created on Monday, November 10.

Bachrodt's duty to bargain arose *as a result* of the employment of a sufficient number of union members on Monday, November 10. The creation of a bargaining relationship does not in itself impose any contractual obligations upon either party. Since Bachrodt had no obligation of any kind either to the union or to its members until after they became his employees, the duty to bargain cannot have limited Bachrodt's right to fix the initial terms of employment of the personnel he hired on November 10.[4]

### III.

Finally, as the prospective owner of the business, Bachrodt might have been under a duty to bargain with the union *before* he hired any of Zimmerman's former employees; under this theory the *initial* terms of employment could not be set without either the union's consent or a bargaining impasse.

In a dictum toward the end of its opinion in *Burns*, the Supreme Court posited a hypothetical situation in which "a successor employer," though not bound by his predecessor's labor contract, might nevertheless be under a duty to "consult with" the union before he fixes the initial terms of employment.[5] Whether this obligation to "consult" is the equivalent of an obligation to bargain to impasse is not entirely clear; assuming that it is, however, I do not believe this rather routine purchase of an automobile agency is the kind of exceptional situation the Court envisioned by its dictum.

*Ordinarily*, as the Court makes clear, a successor employer is "free to set initial terms on which it will hire the employees of a predecessor."[6] The public interest in preserving this freedom for a new owner provided the underlying rationale for the Court's rejection of the Board's contention that the successor was bound by the terms of his predecessor's labor contract.[7] Nevertheless, the Court

---

whether they wanted to work for me."
A. 143.

3. The general counsel never contended otherwise. All of his exhibits use November 10, 1969, as the starting date for Bachrodt's employees. See G.C. Ex. 13, 14, and 15 (A. 192–94).

4. As in *Burns*, it was not clear until after Bachrodt hired his full complement of employees that he had a duty to bargain with the union. Accordingly, the Court's language squarely fits this case:
 "It is difficult to understand how Burns could be said to have *changed* unilaterally any pre-existing term or condition of employment without bargaining when it had no previous relationship whatsoever to the bargaining unit and, prior to July 1, no outstanding terms and conditions of employment from which a change could be inferred. The terms on which Burns hired employees for service after July 1 may have differed from the terms extended by Wackenhut and required by the collective-bargaining contract, but it does not follow that Burns changed *its* terms and conditions of employment when it

specified the initial basis on which employees were hired on July 1." N.L.R.B. v. Burns Int'l Security Servs., Inc., 406 U.S. 272, 294, 92 S.Ct. 1571, 1585.

5. "Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms." *Ibid.*

6. *Ibid.*

7. "A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital." *Id.* at 287, 92 S.Ct. at 1582.

did opine that "there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms."[8] As I read that comment in the context of the entire *Burns* opinion, I cannot conclude that this is the kind of a case in which the Court intended to require a new owner to come to terms—or to reach a bargaining impasse—with the union in advance of closing.

I recognize that a portion of the Court's dictum seems to fit this case. Since Bachrodt did pass out job applications to all of Zimmerman's employees on the Friday before the closing and since he hired almost all of them on Monday, a finding that he had planned to retain all of the employees in the unit might be proper. But no such finding was made by the trial examiner or the Board, and I do not consider it "perfectly clear" that such a finding should have been made.

Prior to the closing, Bachrodt made no commitment to anyone that all, or indeed any, of Zimmerman's employee's would be retained. Bachrodt obviously intended to integrate the Freeport agency into his Rockford operation, and to specify different terms of employment than Zimmerman's. Whether the Zimmerman employees would accept those new terms could not be known until after they were explained on Monday; which of those employees Bachrodt would finally decide to hire could not be known until after each was interviewed. There is no evidence that any employee was essential for the continued operation of the business.

As I read the Court's dictum in *Burns*, it must have been "perfectly clear" *prior to the closing* that all employees in the unit would be retained. Otherwise it would not be "appropriate"—to use the Court's word—to saddle the new owner with any duty to bargain, or even to consult, with the union before setting initial terms of employment. The employ-

ment of union members *after* the closing may properly give rise to a duty to bargain with the union concerning subsequent changes from the initial terms of employment; I do not believe, however, that such post-closing hiring may retroactively establish a pre-closing duty to bargain.

In short, I consider the brief excerpt from *Burns* as positing a narrow exception from the ordinary situation in which the successor has complete freedom to set initial terms; I regard this case as one involving an ordinary purchase transaction in which the new owner should not be penalized because he in fact provided jobs for substantially all of his predecessor's employees.

In my opinion none of the three theories which might support the conclusion that Bachrodt committed an unfair labor practice by setting new terms or conditions when he acquired the business is tenable. The majority agrees that the contract did not survive, but concludes that either Bachrodt's duty to bargain arose before Monday, November 10, or that the terms he set on that day changed some preexisting arrangement with the employees. In support of this conclusion Part IV of Chief Judge Swygert's opinion reads *Burns* as drawing an important distinction between a requirement that Bachrodt honor his predecessor's contract and a lesser requirement that he merely honor it until the union agrees to change it or his efforts to persuade the union to do so have reached the point of impasse.

As a practical matter I wonder how much difference there is between a holding that the new owner is bound by the terms of the old contract, and a holding that he is bound only until he has bargained to impasse with the union. No doubt there are cases in which the impasse date would arise much sooner than the contract expiration date, but in my judgment the time interval between those dates is not of critical importance in evaluating the policy factors involved. What is most important—and I believe

8. *Id.* at 294, 92 S.Ct. at 1586.

*Burns* makes this clear—is the new owner's position at the time he takes over the acquired business. In the normal situation the *Burns* holding encourages the transfer of capital by freeing the purchaser of any obligation to the union, either contractually or in the form of a duty to bargain, until after a new complement of employees has been hired. The *Burns* decision, in effect, finds greater public benefit in preserving the successor's ability to make immediate operating changes than in affording maximum job security to the employees of the purchased business. If only the time interval between the impasse date and the expiration date of a pre-existing contract were on one side of the balance, it certainly would not have outweighed the interests of the employees in clearly defined job security.

Since I believe that Part IV of Chief Judge Swygert's opinion does not give proper effect to the underlying rationale of *Burns,* I respectfully dissent from that part of his opinion.

