NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

Ivo H. DENHAM and Geraldine A. Denham, d/b/a The Denham Company,
Respondents.

No. 71–1943.

United States Court of Appeals,
Ninth Circuit.

Nov. 3, 1972.

Rehearing Denied Dec. 20, 1972.

Steven R. Semler (argued), Nancy M. Sherman, Elliot Moore, Attys., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Peter G. Nash, Gen. Counsel, NLRB, Washington, D. C., Roy O. Hoffman, Director, Region 20, NLRB, San Francisco, Cal., for petitioner.

George J. Tichy, II (argued), of Littler, Mendelson & Fastiff, LeProhn & LeProhn, San Francisco, Cal., for respondents.

Before LUMBARD,* MERRILL and KILKENNY, Circuit Judges.

LUMBARD, Circuit Judge:

The National Labor Relations Board (Board) petitions for enforcement of an order entered pursuant to a finding of violations of § 8(a)(5) and (1) of the National Labor Relations Act (Act) by respondent, the Denham Company (Company). The violations found by the Board involve the Company's refusal to recognize and bargain with Creamery, Condensery Employees & Drivers Union, Local 517, International Brotherhood of Teamsters (Union) as the bargaining representative of certain of its employees, its unilaterally changing the wages and working conditions of its employees, and its refusal to honor the collective bargaining agreement that ex-

isted between the preceding owner of the plant, Swift and Co. (Swift), and the Union. In addition the Board found that the Company interfered with, restrained, and coerced its employees in the exercise of their § 7 rights, in violation of § 8(a)(1).

For many years until 1969 Swift operated an ice cream manufacturing and distribution facility at Hanford, California. In the early 1940's, the Union conducted an organizational drive at this plant and obtained authorization cards from the employees designating the Union as their collective bargaining agent. The Union showed these cards to Swift's local manager and was thereupon recognized as bargaining agent for Swift's employees. Following negotiations, Swift and the Union entered a collective bargaining agreement that was substantially the same as the Union's contract with a group of other dairy manufacturers in the area, except that, because of Swift's national policy against entering contracts containing a Union security clause, the Swift contract did not include such a provision. In lieu thereof, Swift and the Union had an understanding outside the contract that all employees in the bargaining unit would be members of the Union, and all employees did in fact join. The bargaining relationship continued in this form through several contracts until the industry contract was modified to include a "most favored employer" clause.

Because the absence of a union security clause in its contract with Swift might give the other dairy employers the right to remove such clauses from their contracts, the Union then ceased entering formal contracts with Swift. Instead, the trial examiner found, the Union kept Swift informed of the negotiations with the industry group and of the final agreement reached, and Swift would increase wages and money benefits to conform with the industry contract.

---

* The Honorable J. Edward Lumbard, Senior Circuit Judge, Court of Appeals for the Second Circuit, sitting by designation.

In July, 1969, approximately ten years after this change in bargaining policy as a result of which there no longer were written contracts, Swift sold the Hanford plant to Ivo Denham, who was at that time plant manager.[1] The record shows that, at least between the change in bargaining policy and the sale of the plant, an oral union security arrangement was implemented under which, as part of the hiring process, the employees were given Union membership applications and dues checkoff authorizations by the Union plant representative or field representative. All new employees joined the Union under this arrangement. It is not clear from the record whether this arrangement was the same as the extra-contractual union security provision that existed before the change in bargaining policy. On this point, the parties are in dispute, the Board arguing that it was not the same, the Company arguing that it was; there is no explicit determination by the trial examiner on this point.

On July 28, 1969, the employees were informed of the sale of the plant to Denham. That evening, a meeting was held concerning employee insurance. Although Denham was not present at this meeting, the plant superintendent, an independent insurance salesman and employees that were in and out of the bargaining unit were present. There is dispute about what was said at the meeting. The Board contends and the trial examiner found that the insurance salesman, who was a former plant manager and claimed to be speaking for Denham, informed the employees that the Union plan would no longer cover them and described an alternate company health plan. Subsequently, all employees in the bargaining unit signed cards indicating an interest in company insurance. The examiner also found that the plant superintendent at this meeting announced that there would be several changes in working conditions, the details of which

he would discuss with the employees individually. The Company disputes this account of the meeting and claims that it was directed to non-unit employees and that employees in the bargaining unit attended on their own volition and showed an interest in the company insurance.

In the days following this meeting, the plant superintendent spoke with certain employees individually and informed them of changes to be made in wages, overtime work, seniority, and vacation time. When the Union approached Denham concerning these proposed changes and inquired whether he was trying to operate without a Union contract, Denham replied that it was for the employees to decide whether they wanted to remain in the Union. Shortly thereafter, the Union had a meeting of the employees in the bargaining unit, at which all of them voted to remain in the Union and signed a petition to that effect.

On the morning following this Union meeting, Denham called the employees in the bargaining unit into his office; after he had spoken with them, the employees held another meeting. Exactly what was said at these meetings is in dispute. The examiner found that Denham said he knew of the meeting the night before, that he couldn't and wouldn't "go union," that if he had to go union he would close the plant, and that he would try to see that there was a Christmas bonus in their pay envelopes this year. In the subsequent meeting of the employees, at which no management representative was present, the employees voted unanimously to leave the union.

The examiner also found that, several days later, Denham questioned several employees about "how they felt and which way they would go, if they would stand behind him." The examiner concluded that, in the context of Denham's remarks when he called the employees

---

1. Prior to the sale, Denham had been plant manager for three years and had been a Swift employee at the Hanford plant for a number of years before that.

into his office, his questions referred to whether these employees had chosen the Union and the employees so understood the questions.

In its decision and order of December 24, 1970, 187 N.L.R.B. No. 53, the Board adopted the examiner's findings of fact, as well as his recommended order. Thus, the Board found that the Company violated § 8(a)(1) by threatening the employees with plant closure if they continued Union representation, by promising a Christmas bonus if employees renounced the Union, and by interrogating employees concerning their Union sympathies. In addition, the Board found the § 8(a)(5) and (1) violations noted above. Accordingly, the Board ordered the Company to cease and desist from these unfair labor practices and from infringing on the employees' § 7 rights in any manner. The Board also ordered the Company to bargain collectively with the Union upon request, to cancel the unilateral changes and honor the collective bargaining agreement, to compensate the employees for any losses incurred because of the Company's unilateral changes and its refusal to honor the contract, and to post the usual notices.

 The parties agree that one portion of the Board's order has been supplanted by the subsequent decision of the Supreme Court in N.L.R.B. v. Burns Int'l Security Services, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). In that case, the Court rejected the Board's view that the National Labor Relations Act imposed an obligation on a successor employer to honor its predecessor's collective bargaining agreement with the union. Accordingly, the Board no longer asks us to enforce that portion of the Board's order that is based on the Company's refusal to honor Swift's contract, assuming for the moment that an agreement existed with the Union, for the Company was under no such duty.

It is conceded that the Company is a successor employer to Swift and Co. Therefore, the issues here revolve around the legal obligations arising from such relationship. The Board concluded that the Company, as a successor employer, was subject to the duty to bargain with the Union under § 8(a)(5) and the concomitant duty not to make unilateral changes in working conditions both of which it found the Company to have breached. The Burns case also considered the nature of these duties imposed on a successor employer.

 The Court noted that §§ 8(a)(5) and 9(a) of the National Labor Relations Act impose a duty on the successor employer to bargain with the representative of a majority of the employees in an appropriate bargaining unit. Thus, before the successor employer can be held to such a duty, it must be determined that the union involved is such a bargaining representative. The Court determined that this question presented essentially two inquiries: 1) the propriety of the bargaining unit; and 2) the existence of a good faith doubt by the successor employer about the Union's majority status in that bargaining unit. If the first inquiry is answered affirmatively and the second negatively, a successor-employer is subject to the duty to bargain.

 Initially, we must dispose of the Company's first contention that the record does not establish that Swift's original recognition of the Union thirty years ago was proper. This contention is predicated on the Company's evidentiary objection to the testimony of Ted C. Wills, the Union official who organized the plant thirty years ago. The Company argues that the testimony about the employees' completing authorization cards is incompetent to demonstrate the Union's majority status because the cards themselves were the best evidence of that status and were not shown to be unavailable. But the Company did not raise this objection at the hearing when the evidence was offered or in its brief to the trial examiner. Therefore it is too late for the Company to assert that objection now. Local 901, International Brotherhood of Teamsters

v. Compton, 291 F.2d 793 (1st Cir. 1961); N.L.R.B. v. Local 490, Hod Carriers, 300 F.2d 328 (8th Cir. 1962). The uncontradicted testimony of Mr. Wills that the Union had a majority status at the time of its recognition is sufficient to sustain the examiner's and the Board's finding that the "[union representative] discussed the Union with the employees, received authorization cards designating the Union as the collective-bargaining agent for them and showed the cards to . . . Swift."

 The Company has not challenged the propriety of the bargaining unit. Therefore, our attention is focused on the second inquiry above; the question of the Company's good faith doubt about the Union's majority status. Initially, it should be noted that the recognition of the Union by Swift raised a rebuttable presumption of the Union's continued majority status. In *Burns*, the Court said:

> Where an employer remains the same, a Board certification carries with it an almost conclusive presumption that the majority representative status of the union continues for a reasonable time, usually a year. [citation omitted] After this period, there is a rebuttable presumption of majority representation. 406 U.S. 279 n. 3, 92 S.Ct. 1578 n. 3.

In the body of the opinion, the Court concluded that

> a mere change of employers or of ownership . . . [does] not
>
> . . . affect the force of the Board's certification within the normal operative period if a majority of employees after the change . . . were employed by the preceding employer.

Of course, the Union here was not certified by the Board and therefore does not explicitly fall within the Court's language. But it has been held that the rules of the Board relating to the withdrawal of recognition from a certified union should apply to the withdrawal of recognition from a union that was voluntarily recognized after the passage of the "reasonable time" during which there is an irrebuttable presumption of majority status. N.L.R.B. v. Frick Company, 423 F.2d 1327 (3rd Cir. 1970). We adopt that view, and thus place the burden on the Company to establish either that the Union in fact no longer represented a majority of the employees, or that there were circumstances affording a reasonable basis for a good faith doubt about the Union's continued majority.

The Company argues that the Union maintained an illegal union security arrangement with Swift since the time of its recognition and that, therefore, nearly all of Swift's employees were coerced to be members of the Union. On this basis, the Company concludes it had a reasonable basis to doubt the existence of an uncoerced majority and therefore was justified in withdrawing recognition. This argument about the "uncoerced majority" is valid but misplaced. In its support, the Company cites Shipwrecking, Inc., 136 N.L.R.B. 1518 (1962), in which an employer and a union had maintained an illegal union security provision for two years. After noting that this activity had continued for the six month period preceding the unfair labor practice charge, the Board found both the employer and the union to have committed unfair labor practices in maintaining this union security provision. Part of the Board's remedial order was that the employer cease to recognize the union as the collective bargaining agent of the employees. The Company argues, therefore, that this case would indicate that the Board should have directed Swift to cease to recognize the Union because its "majority status . . . was tainted by the illegal support it had received through the unlawful hiring practices and no basis exists for concluding that . . . the Union, in fact, represented an uncoerced majority of the employees involved." *Shipwrecking, supra*, p. 1519. Accordingly, the Company, as Swift's

successor, should not be required to recognize the Union.

■ Although this argument is forceful, it suffers from a basic flaw. We have noted that there is a dispute with regard to whether the illegal union security arrangement existed since the Union's recognition or only for the last ten years. The significance of this dispute is that if the latter is true, then only three of the employees in the Union could have been coerced by it and thus there would be no coerced majority. If the former is the correct statement, then there would be a coerced majority. We need not resolve this conflict in the facts, for we conclude that the statute of limitations in § 10(b) of the National Labor Relations Act precludes us from looking to any coercive effect antedating the six-month period preceding the filing of the charge in the instant case. Local Lodge No. 1424, IAM v. N.L.R.B. (Bryan Mfg. Co.), 262 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). This is not a case in which evidence of events occurring before the six-month period is sought to be used to show that matters within the period constituted unfair labor practices. Bryan Mfg. Co., *supra*, pp. 416–417, 80 S.Ct. 822; N.L.R.B. v. Tragniew, 470 F.2d 669, p. 673 (9th Cir.); Lane-Coos-Curry Douglas Counties Bldg. v. N.L.R.B., 415 F.2d 656, 659 n. 7 (9th Cir. 1969). Only if the record shows that the coercive effect of the Union security arrangement yielded a coerced majority during the six-month period and subsequent thereto would it be permissible to require the withdrawal of recognition; therefore, we reject the Company's argument that it should be permitted to withdraw recognition.

The Board in *Shipwrecking* did not appear to feel that it was limited to correcting only so much coercion as had occurred since six months prior to the filing of the unfair labor practice charge. It is not clear from that decision whether or not the "taint" on the union's majority antedated the period beginning six months before the filing of the charge in that case. If it did, then that case was wrongly decided, for it is in remedying the effects of unfair labor practices that the Board can deal with the problem of a coerced majority. If the coercion of workers constituting a majority is attributable to unfair labor practices that are not within the reach of the Board's remedial powers, it is difficult to see why the Union should be regarded any differently than one whose majority is attributable to the coercion of permissible union security provisions. Therefore, since the record clearly shows that all or nearly all [2] of those workers belonging to the Union were employed prior to the period beginning six months before the filing of the charge in the instant case, we cannot say that the Union's majority was tainted or coerced.

■ The Company suggests three other bases to justify a good faith doubt about the Union's majority status: 1) the fact that all employees in the unit signed up for Company insurance, indicating, the Company contends, an intent to reject the Union and its insurance plan; 2) the fact that a special Union meeting was called to determine whether the employees wished to retain the Union, which the Company contends suggests that even the Union was in doubt about its majority status; and 3) the unanimous rejection of the Union by the employees in a meeting subsequent to the special Union meeting. In reviewing the Board's resolution of factual disputes, this court should not disturb the Board's factual inferences so long as they are reasonable and the evidence supporting them is substantial when viewed in light of the record taken as a whole. N.L.R.B. v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951); N.L.R.B. v. Custom Chair Mfg. Co., 422 F.2d 1300 (9th Cir.

2. In the case of one employee, there was no date available to indicate when he was first employed by Swift.

1971). We conclude that the record justified the Board in finding that the facts did not support a good faith doubt about the Union's majority status.

█ The fact that the employees signed up for Company insurance is too ambiguous an act to infer therefrom an intent to reject the Union, especially in light of the Board's finding, substantiated by the evidence, that the employees were told that the Union plan would be terminated. By the same token, it would be surprising indeed if the Company could predicate a good faith doubt on the Union's calling a special meeting to determine the employees' desires, especially since the meeting resulted in unanimous approval of the Union. We find the Board was justified on the record in rejecting claims of Union coercion at this meeting. The meeting may well have been in response to Denham's suggestion that he doubted the Union's majority; he should not now be able to assert the holding of that meeting as grounds for justifying that doubt. Finally, since we agree with the Board's determination that the rejection of the Union at the subsequent meeting of the employees is attributable to the Company's unfair labor practice, that employee vote cannot serve as a defense to the Company's statutory duty to bargain. Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); Franks Bros. Company v. N.L.R.B., 321 U.S. 702, 64 S.Ct. 817, 88 L. Ed. 1020; N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L. Ed.2d 547 (1969).

█ We also sustain the Board's finding that the Company violated its duty to bargain by unilaterally changing wages and working conditions in the unit. Uncontroverted testimony in the record establishes the fact of unilateral action by Denham. But the Company contends that, under the circumstances of this case, its action did not violate the Act. In support of this contention, the Company refers the court to the Burns case and argues that that case indicates that it was free to set the initial terms of employment for the employees after it purchased the plant from Swift. Specifically, the Company relies on the following language from Burns:

> It is difficult to understand how Burns could be said to have *changed* unilaterally any pre-existing term or condition of employment without bargaining when it had no previous relationship whatsoever to the bargaining unit and, prior to July 1, no outstanding terms and conditions of employment from which a change could be inferred. The terms on which Burns hired employees for service after July 1 may have differed from the terms extended by Wackenhut and required by the collective-bargaining contract, but it does not follow that Burns changed its terms and conditions of employment when it specified the initial basis on which employees were hired on July 1, 406 U.S. 294, 92 S.Ct. 1585 [emphasis in original].

However, as the Board points out, the Court went on to say that

> [a]lthough a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees . . . 406 U.S. 294, 92 S.Ct. 1586.

It appears from the record that the retention of all the employees in the unit was an express condition of the Company's purchase of the business from

Swift, and that the Company in fact took over Swift's workforce intact.[3] Therefore, we conclude that, under the rationale of *Burns,* the Company did violate § 8(a)(5) and (1) by the unilateral action that it took. We do not agree with the Company's argument that the Court's language indicates two requirements in order to find that a successor's unilateral action violated the Act: 1) retention of all of the employees in the unit; and 2) that the circumstances be appropriate for such initial consultation with the Union. The Court recognized only one requirement, the retention of all employees in the unit, and, if that requirement is satisfied, it is then appropriate for the employer first to consult with the collective bargaining agent. In any case, the facts that the Company asserts as circumstances making consultation inappropriate are the same that we rejected as justification for the Company's refusal to bargain with the Union.

 Finally, we consider the Board's findings that the Company interfered with, restrained, and coerced its employees in the exercise of their § 7 rights. Much of the Board's findings here are based on its resolution of conflicting testimony. The Supreme Court has said that

> while the "reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial . . .," it may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" N.L.R.B. v. Walton Mfg. Co., *supra,* 369 U.S. p. 405, 82 S.Ct. p. 854, quoting from Universal Camera Corp. v. N.L.R.B., *supra.*

Since we have concluded that the Board's findings are supported by evidence that is substantial when viewed in light of the record taken as a whole, we are bound by the Board's factual conclusions. In light of the facts as found by the Board, we are of the opinion that the Board was justified in finding that the Company restrained and coerced the employees in the exercise of their § 7 rights in violation of § 8(a)(1). We conclude that Denham's statements with respect to the consequences of the employees' choosing or not choosing to retain the Union exceeded the bounds of permissible employer speech. See N.L.R.B. v. Gissel Packing Co., *supra,* 395 U.S. pp. 618–619, 89 S.Ct. 1918. Therefore, it was proper for the Board to have found Denham's statements to have violated § 8(a)(1) of the Act.

The petition for enforcement of the Board's order is granted, except as to that portion that relates to the Company's refusal to honor the collective bargaining agreement between the Union and Swift.

---

3. This fact serves to distinguish this case from the Sixth Circuit's recent decision in N.L.R.B. v. Wayne Convalescent Center, 465 F.2d 1039 (1972). See note 6, 465 F.2d at 1042.