ZIM'S FOODLINER, INC., d/b/a Zim's IGA Foodliner, and S&O, Inc., d/b/a Paul's IGA Foodliner, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 73–1199.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1974.

Decided April 4, 1974.

Thomas D. Burlage, Samuel W. Witwer, Jr., and Lawrence S. Wick, Chicago, Ill., for petitioners.

Elliott Moore, Deputy Associate Gen. Counsel, Joseph E. Mayer, William Gaus, Corinna Metcalf, Attys., National Labor Relations Board, Washington, D. C., for respondent.

Before HASTINGS, Senior Circuit Judge, and PELL and SPRECHER, Circuit Judges.

HASTINGS, Senior Circuit Judge.

The principal question presented by this case is whether fragmentation of a collective bargaining unit, caused by the piecemeal sale of business assets, precludes the National Labor Relations Board from finding "successorship" and imposing attendant labor obligations upon the successor employer.

Two employers are involved in the instant petition for review. Petitioner Zim's Foodliner, Inc. (hereinafter "Zim's") was found by the Board to have violated § 8(a)(5) of the National Labor Relations Act, Title 29 U.S.C. § 158(a)(5), by refusing to bargain with two unions representing appropriate units of its employees, and by unilaterally changing certain terms and conditions of employment. Zim's also was found to have violated § 8(a)(1) of the Act, Title 29 U.S.C. § 158(a)(1), by engaging in the above § 8(a)(5) violations and by threatening to go out of business in order to discourage employee support for the unions. Petitioner S&O, Inc., doing business as Paul's IGA Foodliner (hereinafter "Paul's"), was found to have violated §§ 8(a)(5) and 8(a)(1) through its refusal to bargain with a single union representative of its employees. Paul's was not found to have instituted unilateral changes or committed independent § 8(a)(1) violations.

Since the underlying facts were quite similar as to each employer, the complaints against both petitioners were consolidated for hearing before an administrative law judge, and a single decision issued. The judge's findings, conclusions and recommended order were subsequently adopted by the Board. The Board order, 201 NLRB No. 141 (1973), is the present subject of review. The Board here cross-petitions for enforcement of its order.

In the summer of 1971, the Kroger Company, a manufacturer, distributor and retailer of food products, undertook to terminate its retail operations in the State of Wisconsin. Pursuant to this undertaking, buyers were sought for its 57 retail outlets in the state.

On July 19, 1971, Kroger executed sales agreements covering two of its Wisconsin supermarkets. The Kroger store in the city of Monroe was purchased by Lowell Zimmer, and the store in Edgerton was purchased jointly by Paul Sanderson and Fred Oreel. Both Monroe and Edgerton are located in the general vicinity of Madison, Wisconsin, and each has a population of less than 10,000. Both businesses were subsequently incorporated by their new owners. The agreements provided for the sale of certain tangible personal property at each store, primarily inventories and equipment, and for the assignment of Kroger's leasehold interests in the store buildings. The purchasers did not agree to buy Kroger good will or other

intangibles, and did not generally assume Kroger liabilities. In particular, the agreements contained no provisions for the buyers' assumption of outstanding labor agreements.[1]

On July 24, Kroger ceased all operations at the two stores, and on July 26, bills of sale and lease assignments were executed in fulfillment of the July 19 agreements. Both the Monroe and Edgerton stores were opened for business by their new owners on July 27 under the names "Zim's IGA Foodliner" and "Paul's IGA Foodliner," respectively.

The record reveals little regarding the labor relations history of the two stores while operated by Kroger. It appears that for some years prior to 1971 Kroger maintained a bargaining relationship with two unions representing multi-store units which included the Monroe and Edgerton stores. These unions were Retail Clerks Union Local No. 1401 (hereinafter "Retail Clerks") and Amalgamated Meat Cutters & Butcher Workmen of North America Local No. 444 (hereinafter "Meat Cutters").[2] At the time of the 1971 sales, two collective bargaining agreements of relevance here were in effect. The first contract, executed November 17, 1970, and effective until June 30, 1973, was negotiated with the Retail Clerks and covered employees other than meat department and supervisory personnel at both stores. Employees at nine other Kroger stores

in the Madison area were covered by this same agreement, bringing the total number of stores included in the bargaining unit to 11. A second contract, covering meat and delicatessen employees at the Monroe store, was negotiated with the Meat Cutters and executed by the parties on May 4, 1971. Four other stores were covered by this contract, which was to be effective through March 24, 1973. The record does not reveal the total number of employees in either multi-store unit.

Both the Retail Clerks and Meat Cutters agreements contained union security clauses providing for union shops. The record indicates, and the administrative law judge so found, that Zimmer, Sanderson and Oreel were all aware of these contracts at the time they purchased the former Kroger stores.

Immediately prior to the July 1971 sales, 16 employees of the Monroe store and 14 employees of the Edgerton store were covered by the Retail Clerks agreement. The Meat Cutters contract applied to three meat department employees of the Monroe store.

Following Kroger's closedown on July 24, a two day hiatus occurred during which the new owners cleaned and restocked their stores for opening. By the time Zim's opened for business on the 27th, the entire former Kroger complement of employees had been hired, i. e., 16 grocery employees and 3 meat depart-

---

1. The record indicates that at least one purchaser—Zimmer—strongly rejected a Kroger proposal during the negotiations that he agree to adopt existing labor contracts.

2. Both petitioners admitted in their answers to the complaints that collective agreements covering employees in appropriate multistore units which included their respective stores had been negotiated "for a number of years prior to * * * July 24, 1971." The minimal evidence introduced at the hearing on the point related only to the Retail Clerks, and consisted of the following testimony by a union official:

Q. By what process was Local 1401 recognized as the collective bargaining representative of the employees in [the Edgerton] store?

A. That store has been organized for a number of years before my time and also at a time in history when there was a Retail Clerks Union Local 1139 in Janesville which covered the Edgerton store. Approximately January 1st, 1963, the Janesville Local 1139 merged with Madison Local 1401.

Q. And Local 1401 has represented the employees in this store since that time?

A. Yes.

\* \* \* \* \*

Q. By what process was Local 1401 recognized with regard to [the Monroe] store?

A. In the same process as previously stated on the Edgerton store.

ment personnel. In addition, the Kroger store manager was retained in his former position. Paul's, on the other hand, hired only 9 of the 14 former Kroger grocery employees at the Edgerton store. With the exception of part-time helpers in the form of Sanderson's wife, son and daughter, however, these 9 comprised the entire employee complement at Paul's outside of the meat department.[3] Like Zim's, Paul's continued to employ the former Kroger store manager.

On July 23, 1971, the Retail Clerks mailed letters to Zimmer and Oreel, informing them of "successor language" in the Kroger collective bargaining agreement and demanding that the agreement be honored. The letters advised that "[t]he successor employer * * * may not unilaterally change wages, hours, [or] working conditions without committing an unfair labor practice and subjecting itself to a back pay order." The letters concluded by stating that if any "special circumstances" existed of which the union was not aware, it was willing to meet with the purchasers and discuss them. Sanderson received a similar letter on July 28.

On August 20, 1971, the Meat Cutters mailed a letter to Zimmer advising him of his obligation to recognize and bargain with the union with respect to Zim's meat department employees, as well as to "honor, adopt and enforce" the Kroger collective bargaining agreement.

Zim's refused to recognize and bargain with either union; Paul's adopted the same position with respect to the Retail Clerks. Likewise, both employers refused to adopt or be bound by the Kroger collective bargaining agreements.

The parties stipulated that Paul's, on July 27, unilaterally reduced wage rates and work hours below those provided by the Kroger-Retail Clerks agreement. On that date Paul's informed its employees of their wages and working hours and subsequently maintained those wages and hours at their announced levels.

As for Zim's alleged unilateral changes, the parties stipulated that in mid-August, "about three weeks after the opening for business on July 27, 1971," the employer unilaterally reduced wage rates of grocery department employees, and reduced work hours of both grocery and meat department employees, below the levels specified by the Kroger agreements. During the three week period, Zim's had continued the wages and hours in effect under Kroger. Zim's subsequently maintained the new wages and hours established in mid-August.

Unfair labor practice charges against Zim's were filed by the Retail Clerks and the Meat Cutters on August 27 and September 16, 1971, respectively. Each charge alleged that Zim's had refused to recognize the union as collective bargaining representative of its employees; had unilaterally changed terms and conditions of employment without bargaining; and had refused to abide by the terms of the Kroger collective bargaining agreement.[4] On September 22, 1971, the Retail Clerks filed a charge against Sanderson with respect to

---

3. The administrative law judge noted that employee members of the immediate families of the new owners would not properly be included in the new units. See 29 U.S.C. § 152(3). This determination is not entirely free from doubt. See NLRB v. Caravelle Wood Products, Inc., 7 Cir., 466 F.2d 675 (1972). Statements herein to the effect that the alleged successors hired their entire employee complements from among former Kroger employees are subject to this possible qualification with regard to Paul's. We need not resolve the question in order to decide the successorship issue here present-

ed, since the result would be the same in either event.

4. At the time of the charges, Board law held that a successor's refusal to abide by the predecessor's collective bargaining agreement was an unfair labor practice. William J. Burns International Detective Agency, Inc., 182 NLRB 348 (1970), enforcement refused on this issue, 441 F.2d 911 (2 Cir. 1971), aff'd sub nom. NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

Paul's, which was subsequently amended on November 24, 1971, to allege violations similar to those attributed to Zim's. The Acting Regional Director issued complaints against both employers. The cases were consolidated for hearing on January 18 and 19, 1972, along with a third case arising out of the sale of the Kroger supermarket in Middleton, Wisconsin.

As to the latter store, the administrative law judge found that the union majority was dissipated as a result of the transfer, and accordingly dismissed the complaint. As to Zim's and Paul's, however, the judge found that the units of grocery and meat employees at the respective stores were appropriate for collective bargaining,[5] and that the new owners stood "as the legal successor to Kroger." He thus concluded that petitioners were guilty of the unfair labor practices hereinabove set forth.[6] The judge's decision recommended the usual remedies, including an order that Zim's and Paul's bargain with the unions and that Zim's make whole its employees for any losses caused by its unilateral changes in wages and hours. Back pay and interest were to be computed according to established Board formulae. As noted above, the Board adopted in their entirety the findings, conclusions and recommended order of the administrative law judge.

Petitioners' basic contention here is succinctly stated in their brief:

> Petitioners submit that, for them to be found successors, a majority of their employees at each store must have been a majority of predecessor Kroger's employees in the entire multi-store units.

In addition, petitioners argue that the change of employers from a "hierarchical corporation"—Kroger—to small, independent operations owned and managed locally, has essentially changed the nature of the employing industry and has thereby precluded successorship. The Board, on the other hand, contends that a rebuttable presumption of continued majority support for an established bargaining representative applies to, and is not rebutted by, an ownership change such as occurred here. The result, says the Board, is that Zim's and Paul's are successor employers and are required to bargain with unions which previously represented a majority of their employees.

### I.

Before proceeding to the successorship issues, we initially confront Zim's contention that the Board's finding of certain independent § 8(a)(1) violations is unsupported by law or substantial evidence. The consequences of such finding are limited in this case to a cease and desist order and the inclusion of appropriate repentant language in the notice to employees.

The administrative law judge found that on or about August 23, 1971, Lowell Zimmer separately told three grocery employees that he could not afford to pay the wages provided in the Retail Clerks' contract and would go out of business if the employees voted for the Retail Clerks as their bargaining representative. While the reported conversations varied as to each employee, our review of the record indicates that the judge's conclusion regarding the import of the conversations is supported by sub-

---

5. Petitioners had admitted the appropriateness of the single store units in their answers to the complaints.

6. The intervening *Burns* Supreme Court decision compelled the judge to reject General Counsel's contention that the successor employers were bound by the Kroger collective bargaining agreements. As to Paul's alleged unilateral changes, the judge found

that the employer had "commenced operation * * * by instituting wage rates and working hours which were less than those provided in the contract under Kroger." From this the judge concluded that Paul's "cannot be held to have made unlawful unilateral changes when it had no 'previous relationship whatsoever to the bargaining unit'" (quoting *Burns*, 406 U.S. at 294, 92 S.Ct. at 1585).

stantial, and indeed uncontradicted, evidence on the record as a whole.[7]

Zim's argues, however, that the statements were "legitimate economic predictions" and as such are protected by § 8(c) of the Act.[8] Such claim is more than merely colorable, since the statements in context seem to indicate a good faith concern about high labor costs and an inability to compete. It is undisputed that Zimmer shortly thereafter did in fact reduce wages substantially.

Nevertheless, Zim's argument overlooks the severe burden which has been placed upon employers seeking to justify such statements by NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969):

> " * * * [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. * * * We therefore agree with the court below that '[c]onveyance of the employer's belief,

even though sincere, that unionization will or may result in the closing of the plant is not a statement of fact unless, which is most improbable, the eventuality of closing is capable of proof.' 397 F.2d 157, 160. * * *" 395 U.S. at 618–619, 89 S.Ct. at 1942.

*Gissel* recognizes that employer predictions of closedown upon unionization are inherently fraught with overtones of reprisal. Furthermore, "a reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." 395 U.S. at 620, 89 S.Ct. at 1943. The burden has been placed upon the employer to justify such statements by objective evidence. NLRB v. Sinclair Co., 1 Cir., 397 F.2d 157, 161 (1968), aff'd sub nom. NLRB v. Gissel Packing Co., *supra*; Mon River Towing, Inc. v. NLRB, 3 Cir., 421 F.2d 1, 11 (1969). Since Zim's made no attempt to meet this burden before the Board, we conclude that its finding of a § 8(a)(1) violation is supported by substantial evidence. NLRB v. Lenkurt Electric Co., 9 Cir., 438 F.2d 1102 (1971), relied upon by Zim's, is not *contra* since there the record affirmatively indicated an objective basis in fact for the employer's statements. 438 F.2d at 1108. Compare also, NLRB v. River Togs, Inc., 2 Cir., 382 F.2d 198 (1967).

Finally, the fact that the statements were made in the context of a successorship dispute, rather than during an active union organizational cam-

---

7. Employee John Gordon testified that Zimmer "said that he wasn't making any money"; that "he talked as if we were going to vote on the Union"; and that "he said I can't tell you how to vote, 'yes' or 'no' for the Union, but if the Union does get in that he wouldn't be able to afford to pay up to Union standards, that he would be bankrupt * * *." Mary Ann Goecks testified that Zimmer told her that "he could no longer work with Union wages * * *"; that the employees "would at some time possibly be asked to revote in the Union"; and that 'if you do vote it in, if the Union comes in, I would have to close the

doors * * *." Finally, Raymond Fiala testified that Zimmer told him that "he didn't think that he could pay the Union scale," and that "if the Union would stay * * * he is afraid that he would have to close the store and we would probably be all out of jobs."

8. "(c) The expressing of any views, argument, or opinion * * * shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

paign, does not relieve the employer of liability. NLRB v. Polytech, Inc., 8 Cir., 469 F.2d 1226, 1231 (1972); *cf.* Mon River Towing, Inc., *supra,* 421 F.2d at 11.

## II.

Our starting point on the successorship question is NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). In *Burns,* the Supreme Court approved a Board bargaining order against a successor employer where 27 of the 42 employees in the successor's starting work force had been employed by the predecessor and where the predecessor employees had been represented by a recently certified union. The Court concluded that "[i]n these circumstances, it was not unreasonable for the Board to conclude that the union certified to represent all employees in the unit still represented a majority of the employees and that Burns could not reasonably have entertained a good-faith doubt about that fact." *Id.* at 278, 92 S.Ct. at 1577. This was true even though, as the dissenters point out, it was "by no means mathematically demonstrable that the union was the choice of a majority of the 42" successor employees.[9] *Id.* at 297, 92 S.Ct. at 1587. Predictably, there was no indication in the *Burns* record that all 27 former employees of the predecessor had voted for the union in the recent certification election, or that any of the 15 new employees favored such representation.

*Burns* thus recognizes that in at least some circumstances, the democratic principle embodied in § 9 of the National

Labor Relations Act is not offended.by procedures which leave some doubt as to the actual, immediate desires of employees with regard to representation. On a previous occasion the Supreme Court held that even clear and undisputed evidence that a majority of employees do not desire a particular bargaining representative may not suffice to upset Board procedures designed to promote stability in the bargaining relationship. Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954).[10] Decisions both in this circuit and elsewhere have recognized this occasional tension between democracy and stability in the labor relations area, and have granted the Board some measure of discretion in achieving a fair balance. NLRB v. Montgomery Ward & Co., 7 Cir., 399 F. 2d 409, 412 (1968); NLRB v. Frick Co., 3 Cir., 423 F.2d 1327, 1332 (1970).

Three factors distinguish our present situation from that in *Burns.* First, the successor in *Burns* began operations within the one-year period during which the prior certification created an "irrebuttable" presumption of continuing union majority. Here, the record does not reveal whether either union was ever formally certified, and it is undisputed that such certification, if any, occurred "a number of years" prior to the successor's takeover. Second, no issue was raised in *Burns* concerning changes in the nature of the employer. Both predecessor and successor apparently operated on a large scale. Here, petitioners strenuously argue that the change from large to small corporate employers is of controlling significance. Third, the bar-

9. This mathematical uncertainty was not, however, the principal basis for the *Burns* dissent. Rather, the four dissenters primarily argued that the absence of any transfer of assets between the predecessor and Burns should preclude successorship. Where a transfer of assets accompanies the hiring of predecessor employees, as in the present case, the dissenters went beyond the majority to indicate that the successor might be required to perform the predecessor's collective bargaining contract. 406 U.S. at 305, 92 S.Ct. 1571 (Rehnquist, J.).

10. In *Brooks,* the Court approved as within the administrative authority a Board rule requiring that a certification be honored for a period of one year, absent unusual circumstances. In dicta, the Court indicated that the Board's establishment of a rebuttable presumption of continuing union majority after the one-year period had expired was likewise within the agency's authority under the Act. 348 U.S. at 104, 75 S.Ct. 176.

gaining units in *Burns* were identically defined and of roughly equal size both before and after the employer change. Both units consisted of plant guards employed to fulfill a service contract covering a single plant. The units at Zim's and Paul's, in contrast to the multi-store predecessor units, consisted of employee groups at single stores.

Since *Burns* leaves unresolved these several problems raised by the peculiar facts of this case, we turn to the substantial body of relevant law developed by the Board and the Courts of Appeal.

 It is well established that a Board certification creates an almost conclusive presumption of continued majority status for a reasonable period of time, usually one year. Thereafter, there exists a rebuttable presumption of majority representation. Brooks v. NLRB, *supra*; NLRB v. Burns International Security Services, Inc., *supra*, 406 U.S. n. 3 at p. 279, 92 S.Ct. 1571. Board orders based on such rebuttable presumption have been enforced on numerous occasions by the Courts of Appeal, including our own. See, *e. g.*, NLRB v. John S. Swift Co., 7 Cir., 302 F.2d 342 (1962); Bally Case & Cooler, Inc. v. NLRB, 6 Cir., 416 F.2d 902 (1969), cert. denied, 399 U.S. 910, 90 S.Ct. 2201, 26 L.Ed.2d 562 (1970); Terrell Machine Co. v. NLRB, 4 Cir., 427 F.2d 1088, cert. denied, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970); NLRB v. Tesoro Petroleum Corp., 9 Cir., 431 F.2d 95 (1970). Furthermore, it is now recognized that the bargaining relationship need not be established by formal certification in order for the presumption to apply. NLRB v. Denham, 9 Cir., 469 F.2d 239 (1972), vacated on other grounds, 411 U.S. 945, 93 S.Ct. 1925, 36 L.Ed.2d 407 (1973); NLRB v. Frick Co., 3 Cir., 423 F.2d 1327 (1970); NLRB v. Master Touch Dental Laboratories, Inc., 2 Cir., 405 F.2d 80 (1968). In *Denham, supra,* the court applied *Burns* and enforced a Board bargaining order against a successor where the union had been recognized on the basis of a card check almost 30 years prior to the ownership change. 469 F.2d at 244. See also, NLRB v. Bachrodt Chevrolet Co., 7 Cir., 468 F.2d 963, 968 (1972), vacated on other grounds, 411 U.S. 912, 93 S.Ct. 1547, 36 L.Ed.2d 304 (1973).

 The rebuttable presumption does not prevent the employer from petitioning the Board for a new election. NLRB v. Laystrom Manufacturing Co., 7 Cir., 359 F.2d 799 (1966); NLRB v. Auto Ventshade, Inc., 5 Cir., 276 F.2d 303 (1960). Nor does it affect the employees' statutory right to seek a decertification election upon the requisite showing of substantial interest. See 29 U.S.C. § 159(c)(1)(A)(ii). The effect of the presumption is merely to require the employer to bargain with the previously recognized representative unless it can show (1) that the union in fact has lost its majority, or (2) at the least, that reasonable grounds exist for good faith doubt as to continuing majority support for the representative. Celanese Corp., 95 NLRB 664 (1951); Terrell Machine Co. v. NLRB, *supra.*

Since some risk is involved in a refusal to bargain, the Board has stated that the better practice is for the employer to continue to bargain while petitioning for a new election. United States Gypsum Co., 90 NLRB 964, 966 (1950). In a successorship case, where grounds for good faith doubt were lacking, the Fifth Circuit observed that "[t]he employer's proper course is to recognize the prima facie union representation of the employees and to continue to deal with the union, but to petition the Board for a new election." NLRB v. Auto Ventshade, Inc., *supra,* 276 F.2d at 307. This may conflict with the Board's subsequent position that some objective grounds for doubting the union's majority also must be shown in order to raise a § 9(c) "question of representation." United States Gypsum Co., 157 NLRB 652 and 161 NLRB 601 (1966). In either event, however, the burden imposed upon employers or employees by Board policy in this area is hardly severe.

■ Where the Board invokes successorship to impose a bargaining obligation upon a party with no previous relations with the union, it has determined, in effect, that the fact of ownership change does not vitiate the otherwise applicable presumptions of continuing majority. This is made clear by decisions which treat good faith doubt regarding majority status as a defense to the imposition of successorship obligations. See *Burns*, 406 U.S. at 278, 92 S.Ct. 1571, quoted *supra*; Tom-A-Hawk Transit, Inc. v. NLRB, 7 Cir., 419 F.2d 1025, 1028 (1969); NLRB v. Interstate 65 Corp., 6 Cir., 453 F.2d 269, 275 (1971); NLRB v. Valleydale Packers, Inc., 5 Cir., 402 F.2d 768, 769 (1968), cert. denied, 396 U.S. 825, 90 S.Ct. 66, 24 L.Ed.2d 75 (1969). In the present case, the administrative law judge specifically found that petitioners did not base their refusals to bargain on good faith doubt. Setting aside the question whether diminution in unit size or changes in the corporate structure of the employer *per se* should be regarded as justifying such doubts, this finding is not disputed here and is, in fact, well supported by the record.

The Board has held that even informal employee statements to the employer regarding employee sentiment may provide a basis for good faith doubt. Wallace Co., 174 NLRB 416 (1969). Evidence that the employees were represented by a different union prior to their recent inclusion in a multi-store unit, or that other unions are demanding recognition, may also support such doubt. Cf. NLRB v. Downtown Bakery Corp., 6 Cir., 330 F.2d 921 (1964). Nothing comparable was presented here. Indeed, Zimmer's various attempts to convince his employees to oppose the union might support an inference that he, at least, believed that employee sentiment was pro-union.

As to the problems of unit size and corporate structure, it matters not whether we analyze them in terms of *per se* doubts regarding union majority, or in terms of their effect upon continuity in the employing industry, the traditional determinant of successorship. See NLRB v. Colten, 6 Cir., 105 F.2d 179 (1939). In either case, the applicable policies are those set forth in *Brooks, supra*: (1) the employees' right to select their bargaining representative, (2) the promotion of stable bargaining relationships, and (3) a "due regard to administrative prudence." 348 U.S. at 103, 75 S.Ct. at 181.

Over the years, the most important element in a successorship determination has been the employee complement of the purported successor. See Goldberg, The Labor Law Obligations of a Successor Employer, 63 Nw.U.L.Rev. 735, 793–799 (1969).[11] Here, all of the employees in the new units were previously employed by the unionized predecessor, and at the same locations. In this respect, the Board's case is even stronger than in *Burns*.

There is, however, some authority for petitioners' contention that a change in the size and operational methods of the employer is also a relevant consideration. See International Association of Machinists v. NLRB, 134 U.S.App.D.C. 239, 414 F.2d 1135, cert. denied, 396 U.S. 889, 90 S.Ct. 174, 24 L.Ed.2d 163 (1969); NLRB v. Alamo White Truck Service, Inc., 5 Cir., 273 F.2d 238 (1959); Atlantic Technical Services Corp., 202 NLRB No. 13 (1973); B&E Supermart, 195 NLRB 349 (1972). Substantial changes in the employing industry may be expected to alter employee expectations and needs, thereby changing employee sentiment with respect to representation. NLRB v. Armato, 7 Cir., 199 F.2d 800, 803 (1952).

11. "Of fifty-nine cases decided by the Board in the past twenty years in which the question of successorship for bargaining purposes was presented, in fifty-one the alleged the successor had a work force composed of a majority of employees who had worked for a unionized predecessor. In all but four of these the Board found the new employer to be a successor for bargaining purposes." 63 Nw.U.L.Rev. at 794.

The administrative law judge heard considerable testimony respecting the changes instituted by Zim's and Paul's subsequent to their takeover of the former Kroger stores. He concluded that:

"Kroger and each Respondent operated at the same location, with substantially the same physical plant and equipment; both sought and served the same customers with the same type of products; and the employees of both had the same primary job functions, immediate supervision, and working conditions, with only minor modifications. While each Respondent's control of the enterprise and the employees is more localized, this difference is not of such magnitude as to be given controlling effect. *Vis-a-vis* the employees in light of their statutory bargaining rights, it cannot he held that the nature of the employing industry in each case—that of a retail grocery supermarket—has basically changed." [Footnotes omitted.]

The changes relied on by the employers here are similar to those found insufficient to defeat successorship in NLRB v. Zayre Corp., 5 Cir., 424 F.2d 1159 (1970), and in NLRB v. Interstate 65 Corp., *supra*. It is apparent that the administrative law judge considered petitioners' contentions but concluded that the changes accompanying this business transfer were not such as to significantly affect employee attitudes. Since such determination is primarily factual and is here supported by substantial evidence, we see no reason to disturb it.

Petitioners also argue that the change here in unit size and definition should bar successorship. Such change, like the change in the size of the employer, permits the possibility that a minority or even none of the employees at Zim's and Paul's may now support the unions.

As exemplified by *Burns*, however, the courts and the Board have imposed the bargaining obligation in situations where mathematics alone might indicate a reasonable basis for doubting continued majority. Numerous cases hold that employee turnover, standing alone, does not give rise to good faith doubts regarding a union's majority status. See, *e. g.*, NLRB v. Bachrodt Chevrolet Co., *supra*, 468 F.2d at 968; NLRB v. John S. Swift Co., *supra*, 302 F.2d at 345; NLRB v. Little Rock Downtowner, Inc., 8 Cir., 414 F.2d 1084, 1091 (1969).

Likewise, mere diminution in the employee complement of the bargaining unit does not relieve the successor of his duty to bargain. Rohlik, Inc., 145 NLRB 1236 (1964) (successor's work force one-third as large as predecessor's); Western Freight Association, 172 NLRB 303 (1968) (work force reduced from 500 to 110); Royal Brand Cutlery Co., 122 NLRB 902 (1959) (work force reduced from 296 to 134). Indeed, this court has enforced a Board bargaining order where the successor retained only 8 of its predecessor's 25 employees. NLRB v. Armato, 7 Cir., 199 F.2d 800 (1952). We there held:

"While the work force was considerably reduced, that factor standing alone did not justify the refusal to bargain. Those employees of [the successor] in the unit defined in the certification were all former [predecessor] employees and members of the union. The fact that they found themselves fewer in number than before warrants no implication that they no longer desired the union to represent them. * * * " 199 F.2d at 803.

*Armato* is dispositive of petitioners' contention that, in order to be held a successor, an employer cannot have hired less than a majority of the employees in the predecessor unit. The case holds, in effect, that the Board may treat a much-reduced bargaining unit as a miniature of the former unit.

Once it is determined that the successor unit is appropriate for bargaining, a change in unit definition, from large to smaller units, would seem not to raise any additional considerations beyond

those disposed of in *Armato*.[12] We therefore do not believe that the Board may be faulted for imposing the same obligation to bargain in the present situation. *Cf.* NLRB v. Geronimo Service Co., 10 Cir., 467 F.2d 903 (1972). There is here no dispute regarding the appropriateness of the new units. Compare *Burns, supra,* 406 U.S. at 297–298, 92 S.Ct. 1571 (dissenting opinion); Emerald Maintenance, Inc. v. NLRB, 5 Cir., 464 F.2d 698, 702 (1972). Nor is there any evidence that the employees of the single stores were originally brought within the multi-store unit by accretion, as in Atlantic Technical Services Corp., 202 NLRB No. 13 (1973). The record positively indicates that the grocery employees, at least, were already represented by the Retail Clerks prior to the merger of union locals which gave rise to the 11 store predecessor unit. See note 2, *supra.* Finally, the Board's action here is consistent with its previous treatment of a multi-store predecessor unit in the retail food industry. See Avenue Meat Center, 184 NLRB No. 94 (1970).

Petitioners rely upon several Board cases, *viz.*: Atlantic Technical Services Corp., *supra*; American Concrete Pipe of Hawaii, Inc., 128 NLRB 720 (1960); B&E Supermart, 195 NLRB 349 (1972); and Thomas Cadillac, Inc., 170 NLRB 884 (1968) enf'd sub nom. International Association of Machinists v. NLRB, *supra.* We have considered these cases but are not persuaded that they dictate a contrary result.

■ We accept as true, as we must on the record before us, that no election has ever been held to directly determine the desires of the employees in the presently defined units. Nevertheless, the unavoidable fact is that the new units were composed entirely of former Kroger employees who had been represented for a considerable period of time by these unions, and that petitioners offered no evidence to indicate that such representation was no longer desired by the employees of these particular stores. Under these circumstances the Board acted within its authority in ordering petitioners to bargain.

We hold, therefore, that the change in unit size here presented does not *per se* relieve petitioners of their duty to bargain. The Board has balanced the competing considerations involved by requiring an employer who succeeds to a portion of a multi-store bargaining unit and who does not choose to bargain with the existing union to show, at the least, some objective basis for doubting the union's continued representative status. Such requirement accords with the realities of the situation, is true to the policies of the Act, and is an appropriate exercise of Board authority.

### III.

■ We recently held in NLRB v. Bachrodt Chevrolet Co., 7 Cir., 468 F.2d 963 (1972), that a successor employer which unilaterally changes terms and conditions of employment after its bargaining obligation has matured commits an unfair labor practice.

The *Bachrodt* decision was subsequently vacated by the Supreme Court and remanded to the Board for further proceedings in light of *Burns.* 411 U.S. 912, 93 S.Ct. 1547, 36 L.Ed.2d 304 (1973). Although our decision in *Bachrodt* was rendered after *Burns,* the Board order which it enforced predated *Burns.* In its brief remand order, the Supreme Court cited two cases which require that review of an administrative agency decision be limited to the grounds upon which the agency itself purported to act. FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 245–250, 92 S.Ct. 898, 31 L.Ed. 2d 170 (1972); SEC v. Chenery Corp., 318 U.S. 80, 87–88, 63 S.Ct. 454, 87 L.Ed.

---

12. A change from a smaller to a larger unit raises more difficult problems due to the inclusion in the successor's work force of employees not previously represented by the union. Even in such a situation, however, a divided Board has recently held that the unit change was not controlling. Spruce Up Corp., 209 NLRB No. 19 (1974), 42 U.S.L. W. 2482.

626 (1943). On the unilateral changes question, our *Bachrodt* decision relied in part on a concept propounded in dicta in *Burns* which the Board had not previously considered.[13]

The original *Bachrodt* decision was reaffirmed by the Board on remand, 205 NLRB No. 122 (1973), and is now pending here upon the Board's application for enforcement.[14] The Board's supplemental decision adopted the reasoning of the Supreme Court as interpreted and applied by the majority in *Bachrodt.*

Although it would appear that the Supreme Court's action in *Bachrodt* was based purely on institutional considerations, we need not pre-judge that case in order to resolve the present controversy. The point of contention in *Bachrodt*, as emphasized by Judge Stevens' dissenting opinion, concerned whether the successor was bound by the predecessor's terms where the successor announced changes on the first day he owned the business. 468 F.2d at 970–972. The majority felt that no changes could be unilaterally instituted subsequent to the formation of the new owner's intention to hire the predecessor employees, which occurred three days prior to the changeover. *Id.* at 969.

Here, in contrast, petitioner Zim's did not institute the challenged wage and hour reductions until some three weeks after its July 27 takeover of the Monroe store. The terms which were changed, while identical to those previously binding on Kroger, had been voluntarily assumed by Zim's as its own initial terms of employment. Paul's, in contrast, instituted its changes simultaneously with takeover and accordingly was found by the Board to have acted lawfully. See note 6, *supra.*

To thus distinguish between Zim's and Paul's on the basis of the timing of wage and hour reductions is not contrary to the teachings of *Burns.* There, the Court held that in the interest of promoting business transfers, a successor may not be compelled to adopt the terms of its predecessor's labor contract. Commenting on the Board's alternative theory of unilateral changes, the Court stated, in pertinent part:

" * * * It is difficult to understand how Burns could be said to have *changed* unilaterally any pre-existing term or condition of employment without bargaining when it had no previous relationship whatsoever to the bargaining unit and, prior to [the date of takeover], no outstanding terms and conditions of employment from which a change could be inferred. The terms on which Burns hired employees for service after [the date of takeover] may have differed from the terms extended by [the predecessor] and required by the collective-bargaining contract, but it does not follow that Burns changed *its* terms and conditions of employment when it specified the initial basis on which employees were hired * * *.

" * * * [T]here is no evidence that Burns ever unilaterally changed the terms and conditions of employment it had offered to potential employees * * * after its obligation to bargain with the union became apparent. * * * " 406 U.S. at 294–295, 92 S.Ct. at 1585–1586 (emphasis by the Court).

This language indicates to us that the Court did not intend to preclude application of the unilateral changes doctrine to employers who voluntarily adopt pre-existing terms and conditions, but who subsequently have second thoughts in the matter. Perhaps a line need be drawn somewhere, although *Bachrodt*, if still good law in this respect, would indicate that the period necessary to estab-

---

13. The Supreme Court also vacated and remanded NLRB v. Denham, *supra*, on identical grounds. 411 U.S. 945, 93 S.Ct. 1925, 36 L.Ed.2d 407 (1973). Like *Bachrodt*, *Denham* had relied on the *Burns* dicta in up-

holding the unilateral changes portion of the Board's order. See 469 F.2d at 246–247.

14. No. 73–2032, filed Nov. 16, 1973.

lish voluntary adoption is quite brief. In any event, the present three-week period is clearly sufficient in this regard. Accordingly, the Board's finding of unlawful unilateral changes by Zim's will be enforced. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. Bachrodt Chevrolet Co., *supra*.

### IV.

The administrative law judge recommended that Zim's make whole its employees for losses caused by unlawful unilateral changes and observed that back pay and interest shall be computed "under the established formulae of the Board." Such recommendation was adopted by the Board.

Zim's argues that a back pay award cannot be justified. In support thereof, it claims that its sales during the first two months of operation ranged from $18,000 to $23,000 weekly, as compared with a weekly Kroger average of $35,000; that the full Kroger employee complement was retained throughout this period despite the reduction in sales; and that had it not reduced wages and hours when it did, it would have been forced to lay off employees. Accordingly, it is argued, the wage and hour reductions were economically required and represented, in effect, the lesser of two evils.

Since wage reductions were relatively substantial, *i. e.*, 87 cents—93 cents per hour, per employee, Zim's estimates that an award of full back pay would exceed $50,000 in amount.

 In view of the wide discretion granted the Board in formulating remedies under the Act, we cannot say that *no* back pay award is proper under these circumstances. NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). Beyond this, the issues are not ripe for determination. "It is the ordinary practice of the Board not to consider the amount of back pay until its general re-

medial order has been enforced by the court on its merits * * *." NLRB v. Nickey Chevrolet Sales, Inc., 7 Cir., 493 F.2d 103, 106 (1974). See also, Nathanson v. NLRB, 344 U.S. 25, 29–30, 73 S.Ct. 80, 97 L.Ed. 23 (1952). The Board concedes in its brief that Zim's contentions here may be raised in post-decree compliance proceedings.

 We merely note that Zim's estimate of back pay liability in excess of $50,000 overlooks the Board's own policy of seeking "to bring about, in unfair labor practice cases, 'a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination.'" F. W. Woolworth Co., 90 NLRB 289, 292 (1950), citing Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). As we emphasized in *Bachrodt*, the successor's duty goes no further than the obligation to bargain with the union until impasse is reached. 468 F.2d at 970. Thereafter, he is free to unilaterally alter terms and conditions as he sees fit, constrained only by his relative economic power *vis-a-vis* the union. The economic factors here put forward by Zim's, if substantiated, will be relevant to the question of what actual harm was suffered by Zim's employees as a result of Zim's refusal to bargain. *Cf.* NLRB v. Mastro Plastics Corp., 2 Cir., 354 F.2d 170 (1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966); Salmon & Cowin, Inc. v. NLRB, 5 Cir., 148 F.2d 941, cert. denied, 326 U.S. 758, 66 S.Ct. 100, 90 L.Ed. 456 (1945).

Review denied.

Enforcement granted.

PELL, Circuit Judge (dissenting).

Judge Hastings, in writing the majority opinion, has addressed the issues in a scholarly, tightly-reasoned fashion. However, it appears to me, notwithstanding the persuasiveness of the opinion, that it extends the law of successorship in the federal labor law area be-

yond proper limits. I therefore respectfully dissent.

Because of the drastic differences between the operational structures and practices of Kroger, on the one hand, and the sole proprietorship, non-chain grocery stores, on the other, the "wholly different case" adverted to in NLRB v. Burns Int'l Security Services, 406 U.S. 272, 280, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), is presented here. Clearly, the Kroger bargaining unit of 11 stores was no longer an appropriate unit.

While the administrative law judge did not find all of the differences of major consequence, we need look only at his decision to be aware of the vast scope of the changes subsequent to the purchase from Kroger. Each store was converted from a division of a nationwide supermarket chain to an individually owned and operated store. Kroger's merchandising, pricing, promotion, traffic and the like were centrally controlled. Kroger store managers had extremely limited discretion as they were required to adhere to Kroger's established programs. After the sale, basically, all decisions were made by the store owners or managers.[1] All personnel matters are handled by the new owners on the local scene. In Kroger's system, the wages, hours, and conditions of employees were essentially fixed in the master union contracts, in which no store was individually treated.[2] Hiring, discharge and disciplinary matters, while formerly conducted at the store level, were submitted by recommendation to Kroger's personnel department for final approval or disapproval.

Other differences noted by the administrative law judge but apparently given little weight by him were as follows:

"Respondents operate a friendlier store; spend less money than Kroger for advertising; purchase and sell more local products; generally have a lower pricing structure; do not use the Kroger label on certain products, but have the IGA label on certain products; sell a smaller variety of precut meat products, thus requiring more cutting in the store; do not use trading stamps as did Kroger; remain open 7 days a week for longer hours, compared to 6 days under Kroger; obtain some of their merchandise from suppliers other than those previously used by Kroger, whereas Kroger had its own meat plant and bakery, and manufactured some of its own grocery products, all of which were supplied to its stores in the area."

The certification status of the unions is lost in ancient history. There is nothing in the record to indicate that any employee of either store presently desired the particular union representation. The employees were members of the union but they had to be under the union shop provisions of the master contract. Both Zim's and Paul's hired employees from no greater than one-eleventh of the Retail Clerks Union unit, i. e., roughly 9% or less of the predecessor's employees in the eleven-store unit. Zim's hired meat cutters from only one-fifth of the Meat Cutters Union unit. I fail to see any basis for the existence of a continuing presumption of majority status after such a material fragmentation of the bargaining units.

The majority opinion cites pertinent authority, which I believe should be controlling here, for the proposition that a change in the size and operational methods of the employer has relevance. Included among these cases is NLRB v.

---

1. The administrative law judge did find some external control in the contracts of the new owners with Gateway/IGA. Gateway Foods, Inc., was a wholesale distributor and the stores would participate in cooperative programs of the Independent Grocers Alliance. Comparability between this loose relationship and the tight control exercised by Kroger is not supported by the record and, I note, it apparently plays no part in the majority decision of this court.

2. The Retail Clerks Union contract did separately deal with the cities covered by the contract in the wage schedules which divided the Kroger's stores into two groups.

Alamo White Truck Service, Inc., 273 F.2d 238 (5th Cir. 1959). The majority opinion, however, then states that the changes relied on are similar to those found insufficient to defeat successorship in NLRB v. Zayre Corp., 424 F.2d 1159 (5th Cir. 1970), and NLRB v. Interstate 65 Corp., 453 F.2d 269 (6th Cir. 1971).

I find little support in these cases for the extension of the successorship rule accomplished in the majority opinion. In *Interstate* there were changes but the acquisition was of a motel which constituted a single bargaining unit. In that case the following principle ·of law is enunciated which I think should be dispositive of the present case:

> "If respondent's 'succession' brought with it a change in the 'essential nature of the [employing] enterprise,' then respondent had no duty to bargain. Tom-A-Hawk Transit, Inc. v. N.L.R.B., 419 F.2d 1025, 1027 (7th ·Cir. 1969)." 453 F.2d at 272.

In *Zayre*, the claimed successor relied upon *Alamo White, supra*. The Fifth Circuit found the reliance misplaced and made the following observation, particularly pertinent to the present case.

> "It is true that in *Alamo White* this Court held that *a change from a large national employer to a small local one prevented the small transferee from being bound as a successor* by the prior bargaining obligations of the transferor. We do not believe, however that *Alamo White* compels a rejection of the Board's conclusion here.
>
> To begin with *the change in Alamo White was from a large national organization to a small business with direct owner participation.* The total number of employees was reduced—only eight of the previously employed 12 mechanics were re-employed—and with the discontinuation of the parts department, a substantial portion of the prior operation was eliminated. Here there was only a change in the type of internal organization. *Both*

*Masters and Zayre were large national companies.* Moreover, the number of employees and the basic size of the operation stayed the same." 424 F.2d at 1163. (Footnotes eliminated and emphasis added.)

Of course, there were other differences. There usually are factual differences in cases. However, it appears to me that *Alamo White*, in its basic large-to-small situation, presents a more significant parallel guideline than does the *Zayre* large-to-large transfer.

In sum, I think the new owners in the situation here involved took free and clear of any duty to bargain based upon a successorship premise. If the employees did desire union representation the matter could have been very easily determined by a resort to election procedures rather than by reliance upon a doubtful presumption which cannot be factually supported on this record.

